STATES UNITED DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 26-CR-20128-JB

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Pages 1-106 |
| vs. | ) Miami, Florida |
| WILNER RENAUD, | ) |
| Defendant. | ) May 26, 2026 2:00 p.m. |

# TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JEFFREY MARK PIERCE
United States Attorney's Office
99 Northeast 4th Street
Miami, Florida 33132

For the Defendant: EVAN LEWIS KUHL
IAN MCDONALD
Federal Public Defender's Office
150 West Flagler Street
Suite 1700
Miami, Florida 33130

Reported By:
Vernita_Allen-Williams@flsd.uscourts.gov
305.523.5938

VERNITA ALLEN-WILLIAMS
Official Court Reporter
United States District Court
400 North Miami Avenue
Miami, Florida 33128

INDEX OF WITNESSES

ASHLEY OLSON:
Direct Examination............Page 6
Cross-Examination.............Page 16
Redirect Examination..........Page 56

KENNETH VELOZ:
Direct Examination............Page 61
Cross-Examination.............Page 69

EXHIBITS ADMITTED

Government Exhibits 1 and 2...................Page 6

01:51PM

(Call to order of the Court at 2:07 p.m.)

THE COURTROOM DEPUTY: Calling the case of the United States of America vs. Wilner Renaud, Case No. 26-CR-20128-Becerra.

Counsel, please announce your appearance for the record, starting with the government.

MR. PIERCE: Good afternoon, Your Honor. Jeffrey Pierce on behalf of the United States.

THE COURT: Good afternoon.

MR. KUHL: Good afternoon, Your Honor. Evan Kuhl, assistant federal public defender, on behalf of Mr. Renaud.

THE COURT: All right. Good afternoon. You may be seated.

So I set this for two things, right. I set this for the motion to suppress, and I set this as oral argument on the motion to dismiss. I am going to do the motion to suppress first; then we will go to the motion to dismiss.

I will tell you I saw the government's response last night. I've read the motion; I've read the response. I don't know if the public defender wants an opportunity to reply. I am going to need a little bit to digest it. I will hear some argument today just maybe on the broad contours of the argument. I suspect we will be back on an argument on the issue because we started to look at it today and started researching it, and I am going to need time with it; so I am just telling you that now.

Yes, Mr. Kuhl.

MR. KUHL: If I may, Your Honor, I would like to reply so I don't need oral argument on it today. If you just want to hold the motion in abeyance, that's totally fine with me. I am happy to give you an expedited reply though to kind of move the process along a little sooner. Just tell me what you would like me to do.

(Beep sounding in the courtroom.)

THE COURT: What is that?

MR. PIERCE: Sorry. That's my computer.

THE COURT: That's all right.

So if you want to get it to me by Monday, you want to take -- well, no. Is that being too generous with your time? No, that would be the regular response time.

MR. KUHL: I think I can get it in by the end of the week.

THE COURT: If you can get it in by Friday, I would appreciate that. Obviously, I know we have the trial date. I am not intending to let that sit past the trial date. I think there are some interesting issues; I can't imagine I won't hear oral argument on it. I still might want to go back and forth with you a little bit on it today just to make sure that I am at least conceptually on the right page as we start researching it and looking at the issue.

All right. So let's start with the motion to suppress. Is the government ready?

MR. PIERCE: Yes, Your Honor.

02:10PM THE COURT: All right. Mr. Kuhl, is the defense ready?

02:10PM MR. KUHL: Yes, Your Honor.

02:10PM THE COURT: All right. Call your first witness.

02:10PM MR. PIERCE: At this time the United States calls Special Agent Ashley Olson.

02:10PM THE COURTROOM DEPUTY: Please raise your right hand.

02:10PM (The witness is sworn.)

02:10PM THE WITNESS: Yes.

02:10PM MR. PIERCE: Your Honor, as a preliminary matter, if I may, Mr. Kuhl and I have agreed that the two exhibits, Exhibit 1 and 2, would be entered without objection.

02:10PM THE COURT: All right. Government's Exhibit 1, I have it here on the bench, are text messages; and then 2 is a flash drive.

02:10PM MR. PIERCE: Correct. The flash drive contains the full entirety of the audio interview that was conducted by Agent Olson. The United States is not going to be playing the entirety of it today, but we will be playing just a short portion.

02:11PM That's just in case, Your Honor, if you wish to listen to the rest of it to get a full understanding of the tone throughout the entire interview.

02:11PM THE COURT: And this is audio only?

02:11PM MR. PIERCE: Audio only, yes.

02:11PM THE COURT: All right. Any objection to Government's 1 or 2?

02:11PM MR. KUHL: No objection.

02:11PM THE COURT: All right. Let's move forward.

(Government's Exhibits 1 and 2 received.)

ASHLEY OLSON,

called on behalf of the government, duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. PIERCE:

02:11PM Q. Good afternoon. Can you please state your name and spell your last name for the record.

02:11PM A. Good afternoon. Ashley Olson. My last name is spelled O-l-s-o-n.

02:11PM Q. And which agency are you currently employed at?

02:11PM A. Homeland Security Investigations.

02:11PM Q. And what is your current title there?

02:11PM A. Special agent.

02:11PM Q. And are you assigned to any specific unit at Homeland Security Investigations?

02:11PM A. Yes. I am assigned to the document and benefit fraud task force group.

02:11PM Q. How long have you been a part of that group?

02:11PM A. Almost five years.

02:11PM Q. What types of cases are you assigned to investigate as part of the document and benefit fraud group?

02:11PM A. We investigate financial crimes, immigration fraud, identity theft, and more recently voter fraud.

Q. So I want to turn your attention to what brings you here today.

Were you assigned to investigate a case involving a person by the name of Wilner Renaud?

A. Yes.

Q. Do you see Mr. Renaud here in court today?

A. Yes, I do.

Q. Can you identify him by an article of clothing that he is wearing.

A. He is directly behind you, wearing a beige tan jump set.

MR. PIERCE: Let the record reflect that the agent has properly identified the defendant.

THE COURT: So reflected.

BY MR. PIERCE:

Q. What was the reason that you were investigating the defendant?

A. We had received information from the supervisor of elections here in Miami-Dade County alleging that the defendant may have registered to vote and voted in an election and he was not a citizen.

Q. What information or documents were you able to obtain as part of your initial investigation into the defendant?

A. We obtained official voter registration records and also records of voting in any election here in Miami-Dade.

Q. Did you also receive information as to where the voting actually took place?

02:13PM A. Yes, we did.
02:13PM Q. And did all of these activities appear to take place in the Southern District of Florida?
02:13PM A. Yes.
02:13PM Q. Now, once you reviewed all of these documents, did you attempt to locate the defendant?
02:13PM A. Yes, we did.
02:13PM Q. What was the purpose of trying to locate him?
02:13PM A. We wanted to locate him in order to conduct an interview and ask him questions to determine if, in fact, he did register to vote and vote.
02:13PM Q. Now, describe for the Court your attempts to contact the defendant.
02:13PM A. When we were conducting research, the last known address was at Camillus House here in Miami; so we went to Camillus House in order to see if he was staying there and when the last time he checked in was.
02:13PM Q. And just for clarity, what is Camillus House?
02:14PM A. It is a homeless shelter.
02:14PM Q. And the address that was provided, was that a physical address or was it something else?
02:14PM A. It was the physical address for Camillus House.
02:14PM Q. Did you ever learn if the defendant kept a different type of address at Camillus House?
02:14PM A. Yes. He had a PO Box in order to receive mail.

02:14PM Q. Now, did you go to Camillus House in an attempt to find the defendant?
02:14PM A. Yes, we did.
02:14PM Q. And what happened when you got to Camillus House?
02:14PM A. We arrived to Camillus House and everyone has to go through security before entering, so I had asked the security guard that was on duty if, in fact, the defendant was there that day and if we were able to talk to him.
02:14PM Q. And was the defendant there that day?
02:14PM A. No, he was not.
02:14PM Q. So what did you do?
02:14PM A. I provided my business card to the security guard and asked if he would kindly give me a call next time the defendant was there and checked in.
02:14PM Q. Now, did you ever receive any type of correspondence from the defendant after you left your business card at Camillus House?
02:15PM A. I received a voicemail from him a few days later.
02:15PM Q. And did you call him back?
02:15PM A. No. I was out of the office that day; so after I listened to his voicemail, I did respond with a text message.
02:15PM Q. And were all of your correspondence with the defendant via text message in order to set up a time and a place to meet with him to talk?
02:15PM A. Yes.
02:15PM MR. PIERCE: And, Your Honor, I would direct the Court's

02:15PM attention to what's already been previously admitted as United States Exhibit 1.

02:15PM BY MR. PIERCE:

02:15PM Q. So did you and Mr. Renaud or the defendant agree on a date and time to meet?

02:15PM A. Yes, we did.

02:15PM Q. And what date and time was that?

02:15PM A. Monday, February 9th, at 10:00 a.m.

02:15PM Q. So let's turn to February 9, 2026, at 10:00 a.m., did you arrive at Camillus House to speak with the defendant?

02:15PM A. Yes.

02:15PM Q. Was there anyone else with you?

02:15PM A. Yes. There was Special Agent Kelly Hughes, who was also an agent assigned to my group; and we had Max Duarte, who is a task force officer assigned to my group. He works with citizenship and immigration services as a fraud officer.

02:16PM Q. So describe what happened when you showed up to interview Mr. Renaud and when you got to Camillus House.

02:16PM A. When the three of us arrived, we went through security and stated the reason that we were there was in order to see if the defendant was there and talk to him.

02:16PM Q. Was he there when you arrived?

02:16PM A. He was not there directly at that moment; so we went through security and went on to the waiting area in the lobby.

02:16PM Q. Did you eventually see the defendant arrive?

02:16PM A. Yes.
02:16PM Q. How did he arrive?
02:16PM A. He arrived off of the city of Miami bus.
02:16PM Q. So when he arrived off the bus, describe what happened when you first encountered him.
02:16PM A. He came into the lobby and, you know, we knew who he was. So we walked up to him, and the three of us introduced ourselves and showed him our credentials.
02:17PM Q. Your law enforcement credentials?
02:17PM A. Yes.
02:17PM Q. Were you wearing any law enforcement uniforms that day?
02:17PM A. No.
02:17PM Q. Were you wearing any type of clothing or law enforcement insignia when you met with the defendant?
02:17PM A. No.
02:17PM Q. Did any of your have your firearms on you that?
02:17PM A. Special Agent Hughes and myself did, but they were not visible. They were concealed.
02:17PM Q. Were they concealed the entire time that you were with the defendant?
02:17PM A. Yes.
02:17PM Q. So after you introduced yourselves to the defendant, show him your law enforcement credentials, what happened next?
02:17PM A. We had approached the security or, I'm sorry, the secretary in the lobby waiting area and asked if there was somewhere that we

02:17PM could go just with more privacy so we could talk to the defendant.
02:17PM Q. Why would you need more privacy?
02:17PM A. It was very loud and there was lots of people in the waiting area; and just due to, you know, information and the questions we were asking, just so other people didn't hear his business and what was going on.
02:17PM Q. Did you ask the defendant if it was okay to go into that office to answer some questions?
02:18PM A. Yes.
02:18PM Q. So you all go into this office for an interview, correct?
02:18PM A. Yes, correct.
02:18PM Q. Can you describe what that office looked like?
02:18PM A. It was an average sized office. When you walked in, there was a desk with chairs on each side of the desk, along with a filing cabinet behind the desk, and then there was also a window that looked -- you could see the other side hallway into Camillus House.
02:18PM Q. And could you see people walking by out that window?
02:18PM A. Yes.
02:18PM Q. Where did everybody position themselves within the office?
02:18PM A. The defendant sat on one side of the desk with the window behind him, and then I sat on the other side of the desk along with Special Hughes, who was next to me, on the filing cabinet, and then Officer Duarte was next to her to the left.
02:18PM Q. And was the door opened or closed during the course of this

02:18PM interview?
02:18PM A. The door was closed.
02:18PM Q. And why did you close the door?
02:19PM A. We closed the door just because it was loud outside, and that way we could have, you know, more private conversation.
02:19PM Q. Did you lock the door?
02:19PM A. No.
02:19PM Q. Did you or any of the other agents block the door to prevent the defendant from leaving at any time?
02:19PM A. No.
02:19PM Q. Was the defendant ever handcuffed or restrained prior to or during the course of the interview?
02:19PM A. No.
02:19PM Q. Was the defendant -- actually, strike that.
02:19PM Did you provide the defendant his Miranda rights?
02:19PM A. No.
02:19PM Q. Why not?
02:19PM A. Because at this time the subject was not in custody and this is just the preliminary beginning stages of the investigation, and we were just trying to determine and get more information on if he did, in fact, vote and register to vote.
02:19PM Q. Did you ever inform the defendant that he was free to leave or not answer any of your questions?
02:19PM A. No.
02:19PM Q. Was this interview audio recorded?

A. Yes, it was.
Q. And who recorded this interview?
A. Special Agent Hughes.
Q. And what's the purpose of recording the interview?
A. Having an audio recording of the interview helps because although we do take notes throughout the interview, hearing it and being able to play back the interview and know exactly what was said and the context, it does help us review and then document in reports an accurate description of the interview.
Q. Did you inform the defendant that he was being interviewed?
A. No, we did not.
Q. Why did you not inform him that he was being recorded?
A. Because at this time he was not in custody.
Q. I am now going to play the first portion of this audio interview. This is United States Exhibit 2, and it will be played from the very beginning of zero point zero zero seconds to one minute and 20 seconds.

(Audio played.)

MR. PIERCE: For some reason it stopped playing. One second, Your Honor. For some reason it stopped playing.

(Audio played.)

MR. PIERCE: It stopped playing. I think there is a technical issue on this, but Your Honor has the entirety.

THE COURT: Is that it?

MR. PIERCE: It's slowly reloading. It ended. It

02:23PM stopped at 59 seconds. But again, just for Your Honor and for the
02:23PM record, you have the entirety of it to listen to.
02:23PM BY MR. PIERCE:
02:23PM Q. So you got to hear a portion of that audio recorded interview,
02:23PM correct?
02:23PM A. Yes.
02:23PM Q. And you heard your voice on there?
02:23PM A. Yes, I did.
02:23PM Q. And was that a fair and accurate representation of the
02:23PM interview that you had with the defendant on February 9th, 2026?
02:23PM A. Yes.
02:23PM Q. Over the course of that interview, did you or any of the other
02:23PM agents make any threats towards the defendant?
02:23PM A. No.
02:23PM Q. Over the course of that interview did you or any of the other
02:23PM agents force the defendant to answer any of your questions?
02:23PM A. No.
02:23PM Q. Over the course of the interview did you or any of the other
02:23PM agents force the defendant to turn over any documents?
02:23PM A. No.
02:23PM Q. Approximately how long did the interview take that day?
02:24PM A. Approximately 45 minutes.
02:24PM Q. And after the interview was concluded, what happened?
02:24PM A. We all exited the room and exited out of the lobby of Camillus
02:24PM House, and the three of us, myself, Agent Hughes, and Officer

02:24PM Duarte, got in our vehicle, and then the defendant proceeded to get on the bus and leave.
02:24PM Q. So the defendant was not placed under arrest that day?
02:24PM A. No.
02:24PM MR. PIERCE: I have no further questions.
02:24PM THE COURT: Cross-examination.

02:24PM CROSS-EXAMINATION

02:24PM BY MR. KUHL:
02:24PM Q. Hi, Agent Olson.
02:25PM A. Hi. Good afternoon.
02:25PM Q. All right. So you touched a little bit on your law enforcement experience.
02:25PM Prior to being a special agent with the Department of Homeland Security, specifically Homeland Security Investigations, what did you do for a living?
02:25PM A. I worked for United States Citizenship and Immigration Services for almost 13 years.
02:25PM Q. Okay. All right. Did you have a job before that as well?
02:25PM A. That was my first job out of college.
02:25PM Q. What did you study in college?
02:25PM A. Criminal justice.
02:25PM Q. Where did you go to school?
02:25PM A. University of Nebraska at Lincoln.
02:25PM Q. So you went to the University of Nebraska, studied criminal justice; then worked at USCIS; then made the move to HSI in 2020?

A. It was -- I accepted the position in 2020, but I started in early 2021.
Q. Okay. ]When did you move to Miami?
A. In 2018.
Q. So you talked about the type of stuff that you focus on at HSI.
You said more recently you've been working voter fraud cases; is that right?
A. Yes.
Q. So I want to understand the kind of voter fraud you're investigating.
Obviously, this is a case about noncitizen voting; so you're investigating that, right?
A. Yes, correct.
Q. Are you also investigating cases involving identity theft?
A. Yes.
Q. So that's someone is using another person's identity in order to vote?
A. Yes, it could go down that route.
Q. What's another route that it could go down?
A. So we investigate other crimes involving identity theft. We have not specifically investigated an identity theft with voter fraud.
Q. Do you investigate cases where people are voting after having previously been convicted of a felony?

02:26PM A. Yes.
02:26PM Q. This task force that you're on, when was it created?
02:26PM A. It was considered a task force group. It's been around for over eight years; it just is the name, and they change our priorities within the group.
02:27PM Q. Okay. So when did you your priority change to start focusing more on voter fraud cases in contrast to the other types of cases you've been working on?
02:27PM A. With the new administration.
02:27PM Q. So you said you have been here since 2018.
02:27PM Prior to this case, were you familiar with Camillus House?
02:27PM A. Yes.
02:27PM Q. You understand it is a homeless shelter?
02:27PM A. Yes.
02:27PM Q. It is a service provider for homeless individuals in Miami?
02:27PM A. Yes.
02:27PM Q. And you understand that it's run as a Catholic charity?
02:27PM A. Yes.
02:27PM Q. Had you been to Camillus House prior to today -- I'm sorry, prior to early February when you were investigating this case?
02:27PM A. Yes.
02:27PM Q. You said on direct that the investigation into Mr. Renaud -- well, let me ask a better question.
02:27PM The investigation began after the supervisor of elections
02:28PM informed you that Mr. Renaud may have voted, despite being a

noncitizen?
A. Yes.
Q. Had you requested that information from the supervisor of elections?
A. We received information on multiple individuals; it wasn't just one; and then we request the specific documents via subpoena for the individuals --
Q. Okay.
A. -- after conducting our research on immigration status.
Q. So how did you ascertain exactly that he was living at Camillus House?
A. It was on his driver's license.
Q. It was on his driver's license. How did you get a copy of his driver's license?
A. Through our system database DAVID.
Q. I thought that the DAVID had not been acquired yet by the government.
A. We can review it. We can log in and see it; we don't have the certified documents from DAVID.
Q. What documents did you review before you sought to speak with Mr. Renaud in February?
A. A copy of his driver's license and then the official voter registration applications and also the voting records from supervisor of elections in Miami-Dade County.
Q. You had probable cause to arrest him before you sought to

02:29PM speak to him?
02:29PM A. No.
02:29PM Q. So let's go to February 6th; that's a Friday. That's the day that you show up at Camillus House, right?
02:29PM A. Yes.
02:29PM Q. You asked the security guard whether Mr. Renaud was there?
02:29PM A. Yes.
02:29PM Q. And you asked that question after identifying yourself as law enforcement?
02:29PM A. Yes.
02:29PM Q. And he confirmed for you that Mr. Renaud resided there?
02:29PM A. Yes. He pulled up his records of individuals, their check-ins, and how often they are there and what day they check in.
02:30PM So according to his records on that day, he did not check in and was not there.
02:30PM Q. So you left your -- you left your business card with the security guard?
02:30PM A. Yes.
02:30PM Q. And the security guard, he is wearing a uniform?
02:30PM A. Yes.
02:30PM Q. It wasn't the head of security Camillus House, Rick Gonzalez, right?
02:30PM A. I don't believe so.
02:30PM Q. Have you ever communicated with Rick Gonzalez, the director of

02:30PM security at Camillus House?
02:30PM A. No.
02:30PM Q. So you leave your business card, and Mr. Renaud calls you?
02:30PM A. Yes.
02:30PM Q. But you don't return the call?
02:30PM A. No.
02:30PM Q. You respond with a text message?
02:30PM A. Yes.
02:30PM Q. Let's do this.
02:30PM MR. KUHL: May I have the ELMO, please, Miss Hamm.
02:30PM BY MR. KUHL:
02:31PM Q. So this has already been admitted into evidence as Government Exhibit 1, I believe. That's the text message. I have made my own copy, and I have already labeled it.
02:31PM So I'm showing you what's been previously been marked as Defense Exhibit A. Can you see this on your screen, Agent Olson?
02:31PM A. Yes.
02:31PM Q. So Mr. Renaud left you a voicemail, and you responded via text message. Is this text message at the top the first message that you sent to him?
02:31PM A. Yes.
02:31PM Q. What does it say?
02:31PM A. Hi, Wilner. I received your voicemail. I am out of the office today. Would you be available at Camillus House Monday, February 10th, around 11:00 a.m. for us to ask a few questions?

02:31PM Q. And did Mr. Renaud respond?
02:31PM A. Yes.
02:31PM Q. What did he say?
02:32PM A. Yes, I would be available. So, do you want me to meet you there at 11:00 a.m.? If yes, please confirm me. Thank you and have a blessed weekend. Wilner.
02:32PM Q. And how did you respond to that?
02:32PM A. Yes, please meet us there at 11:00 a.m. Monday. Confirmed. Thank you and have a blessed weekend.
02:32PM Q. And how did Mr. Renaud respond?
02:32PM A. I received it. Thank you and see you there God's willing. God bless you.
02:32PM Q. So that's the entirety of your communication with him on February 6th?
02:32PM A. Yes.
02:32PM Q. So we're jumping ahead now to Sunday, February 8th. You reached out to Mr. Renaud again; is that correct?
02:32PM A. Yes.
02:32PM Q. What do you say to him?
02:32PM A. Wilner, do you happen to be available at 10:00 a.m. tomorrow instead of 11:00? Something came up, so I need to be there earlier. Just confirm that 10:00 a.m. tomorrow will work.
02:33PM Q. And did Mr. Renaud respond?
02:33PM A. Yes.
02:33PM Q. When did he respond?

A. Monday, February 9th, at 4:41 a.m.
Q. And then you texted him at 10:00 a.m., and what did you say?
A. We are here outside.
Q. Now, his response to you has a timestamp of February 9th at 12:25 p.m. To your knowledge is that an accurate timestamp?
A. No.
Q. So the next message that he sends you, which I am going to ask you in a moment to read into the record, at what time do you think you actually received that message?
What time do you think he sent that message? Excuse me.
A. He arrived shortly after 10:00 a.m. when we were there, a few minutes after we got there; so if I had to approximate, probably a few minutes after 10:00 he sent that when he got there.
Q. And so what does he say to you?
A. Good morning, Officer Ashley. I am here now at Camillus House waiting for you. Thanks, Wilner. Officer Ashley, it's me Wilner. Please text me your email address so that I can forward you some documents. I misplaced your business card; I can't find it. Thank you, and have a place blessed day.
Q. So does he send you both of these messages before the interview or after?
A. I'm not sure the order that he had sent them, but this is the order it came through.
Q. Okay. All right. So when you're setting up this meeting, he knows that you're part of the Department of Homeland Security --

02:34PM A. Yes.
02:34PM Q. -- because he has your business card?
02:34PM A. Yes.
02:34PM Q. But he doesn't know why you want to talk to him, correct?
02:34PM A. Correct.
02:34PM Q. You did not tell him you were an investigating him for a
02:34PM crime?
02:34PM A. No.
02:34PM Q. And you did not coordinate your visit through the staff at
02:34PM Camillus House?
02:34PM A. No.
02:34PM Q. You coordinated directly with Mr. Renaud?
02:34PM A. Yes.
02:35PM Q. And again, you did not ask Rick Gonzalez, the director of
02:35PM security at Camillus House, for permission to speak with Mr.
02:35PM Renaud at Camillus House?
02:35PM A. No.
02:35PM Q. Did you know that at least in the view of Camillus House,
02:35PM you're supposed to do that?
02:35PM A. No.
02:35PM Q. Would it surprise you to learn that Mr. Gonzalez was not
02:35PM pleased when he heard that this interrogation occurred on their
02:35PM property without his knowledge or consent?
02:35PM MR. PIERCE: Objection, Your Honor. Relevance.
02:35PM THE COURT: Overruled.

THE WITNESS: There had been previous interviews and people coordinating prior, and we were not aware of that issue.
BY MR. KUHL:
Q. So you set up this meeting for 10:00 a.m. on February 9th, right?
A. Yes.
Q. Look, I'm not trying to catch you up in a lie. I've done a site visit of Camillus House. I think we're talking about the same space, but my next few questions are just to kind of make sure we're on the same page; so if you don't remember something, tell me, that's totally fine.
But I'm just trying to make sure we're operating on the same geography, okay. Do you understand?
A. Yes, I understand.
Q. All right. Have you heard of a program called Google Earth before?
A. Yes.
Q. So I am going to show you what's been previously marked as Defense Exhibit B. It is a screenshot of a satellite view of Camillus House. Can you see that on your screen?
A. Yes, I can.
Q. Okay. Now, up here, this is north; down here is south.
Now, I think the entrance that we're talking about, it's at the south end of this; is that right?
A. Yes. It's right actually where it says the FPL Power To Care

02:37PM Facility.
02:37PM Q. Okay. That's what I thought. All right.
02:37PM A. Yes.
02:37PM Q. I have a larger version, so let me go ahead and put that on the ELMO. This has been previously marked as Defense Exhibit C. Can you see that on your screen?
02:37PM A. Yes, I can.
02:37PM Q. This car at the bottom with the red and blue lights, do you see that?
02:37PM A. Yes.
02:37PM Q. That's a police car in the satellite view, right?
02:37PM A. Yes.
02:37PM Q. This is obviously taken on a different day than the day that you were there. But again, not trying to hide the ball, there is a police car there when I went.
02:37PM So on February 9th when you went, was there a police car parked right there?
02:37PM A. I do not recall because I believe they do have security there every day.
02:37PM Q. And when you and your colleagues, you showed up on February 9th, where did you park?
02:38PM A. They have directly to the east of this police car on the screen, there is another security guard shack, and then there is a couple parking spaces that just -- you can back into.
02:38PM Q. Here, let me put on Defense Exhibit B again; that might be

better.

A. Yes.

Q. So where did you park?

A. So south, like right by the over -- I am going to call it an overpass, I know it's not -- but the roadway directly below there, there is a parking lot, and then there is two openings that you can just back into straight right behind this.

Q. Okay. All right. Is it the Miami-Dade Corrections parking lot? Does that sound familiar?

A. We didn't park -- we can't get inside of it. There's just other additional open parking spaces directly east of that police car, so we just parked over there.

Q. Okay. I think we're about to be on the same page; but let me just make sure.

So you've heard of Google Earth. I imagine you've heard of Google Street View, yes?

A. Yes.

Q. All right. I'm showing you what's been previously marked as Defense Exhibit D.

MR. KUHL: Miss Hamm, is it possible to remove the little purple triangle from the screen? I have never known how to do that. Thank you.

THE COURTROOM DEPUTY: You're welcome.

BY MR. KUHL:

Q. So I think we're looking at a street view of the entrance to

02:39PM Camillus House; do you agree with me?
02:39PM A. Yes.
02:39PM Q. And so you see this tented area on the left that says supported by Florida Blue?
02:39PM A. Yes.
02:39PM Q. That's the line -- the security line to get into the facility, correct?
02:39PM A. Yes, correct.
02:39PM Q. Now, I'm going to show you what would happen if we just move over one click. So this is Defense Exhibit E. Do you see that on your screen?
02:40PM A. Yes.
02:40PM Q. Okay. Over here to the right there is, like, a covered area in this building.
02:40PM Is that where the lobby is that you're talking about?
02:40PM A. Yes, correct.
02:40PM Q. And so it's you go through the security line on the left, you go through a metal detector, and then the lobby is to the right?
02:40PM A. Yes.
02:40PM Q. And so it's your testimony that on the day of the interrogation you go through the security line before Mr. Renaud gets there?
02:40PM A. Yes.
02:40PM Q. Okay. And you deal with the security guard?
02:40PM A. Yes.

02:40PM Q. And it is a uniformed security guard?
02:40PM A. Yes.
02:40PM Q. And you're carrying your service weapon?
02:40PM A. Yes.
02:40PM Q. And HSI Special Agent Hughes, also carrying her service weapon?
02:40PM A. Yes.
02:40PM Q. But the guy from USCIS, no service weapon?
02:40PM A. Correct.
02:40PM Q. So you have to remove your service weapons to go through security; is that right?
02:40PM A. No.
02:40PM Q. He allowed you to just wear your service weapon?
02:40PM A. Yes.
02:41PM Q. You had to identify yourself?
02:41PM A. Yes.
02:41PM Q. Okay. And you showed him your badge?
02:41PM A. Yes.
02:41PM Q. He knows you're law enforcement --
02:41PM A. Yes, and then we walked in.
02:41PM Q. -- and then he was going to let you keep your weapon? Okay.
02:41PM So you're waiting in this lobby area on the right here for Mr. Renaud?
02:41PM A. Yes.
02:41PM Q. And then ultimately you see that he goes through security and

02:41PM comes into the lobby?
02:41PM A. Yes.
02:41PM Q. Okay. And you knew what he looked like, so? Right?
02:41PM A. Yes.
02:41PM Q. Okay. So you approach him?
02:41PM A. Yes.
02:41PM Q. At that point had you already kind of set up shop in that office space that's adjacent to the lobby?
02:41PM A. No. We hadn't even seen the room yet.
02:41PM Q. Okay. And you don't start recording -- excuse me.
02:41PM Special Agent Hughes does not start recording until you're already in the room?
02:41PM A. Yes.
02:41PM Q. So there is a conversation that occurs before the recording?
02:42PM A. Yes.
02:42PM Q. What's the substance of that conversation?
02:42PM A. When the defendant walked into the lobby, he kind of noticed all of us standing over to the side, so he walked over. We walked up to him, said, you know: Wilner? He said: Yes. And then we identified ourselves, showing him our credentials, all three of us, and then we walked off to the side a little bit, and we spoke with the secretary at the front of the lobby, and that's when we asked to have another space to go to talk to the defendant.
02:42PM Q. Okay. And so you're walking into the lobby; the secretary desk is right in front of you, right?

02:42PM A. Yes.
02:42PM Q. And so this office space you're talking about, if you're looking at the secretary desk, it's to your left?
02:42PM A. No, it's directly behind the secretary desk.
02:42PM Q. It's directly behind the secretary's desk?
02:42PM A. It was someone's office that they let us use.
02:43PM Q. They let you use someone's office?
02:43PM A. Yes.
02:43PM Q. Okay. Are you familiar with the space that's adjacent to the lobby?
02:43PM A. No.
02:43PM Q. No. You did not interrogate him in that room?
02:43PM A. No.
02:43PM Q. You used someone else's office?
02:43PM A. Yes, the secure -- or the secretary said that this was the space we could use that was available.
02:43PM Q. And it's directly behind the secretary's office?
02:43PM A. Yes, correct.
02:43PM Q. And that office has a window?
02:43PM A. Yes.
02:43PM Q. That looks to the interior or the exterior?
02:43PM A. The interior.
02:43PM Q. It looks into a hallway?
02:43PM A. Yes.
02:43PM Q. Okay. So it's -- just to the left of the secretary's desk is

02:43PM a hallway, correct?
02:43PM A. Yes, that's where we walked to the office space behind where
02:43PM the secretary sat; and then the hallway was behind directly --
02:43PM Q. Did you enter the hallway first?
02:43PM A. Are you asking where you could see the window through, that
02:44PM hallway? Or just the main -- just the main lobby area that we
02:44PM were walking into? There was no specific other hallway.
02:44PM Q. No. My understanding of the layout of the room is there is a
02:44PM secured -- I'm sorry, a secretary's desk right in the main
02:44PM entrance lobby; to the left of that there is a hallway behind a
02:44PM door that's restricted where it's just staff, right, where you can
02:44PM get into the hallway?
02:44PM A. No, we did not go back there.
02:44PM Q. You did not go back there.
02:44PM You went to a room in between the secretary's desk and
02:44PM employee space?
02:44PM A. Yes.
02:44PM Q. And that room has a window that looked out into the hallway?
02:44PM A. Yes, correct.
02:44PM Q. All right. Is there a security camera in that room?
02:44PM A. I do not recall.
02:44PM Q. Okay. Did you obtain any security camera footage from
02:44PM Camillus House?
02:44PM A. No.
02:44PM Q. No. So you don't have the footage from February 9th?

02:44PM A. No.
02:44PM Q. Would it surprise you to learn that Camillus House retained security footage for only 60 days?
02:45PM A. No.
02:45PM Q. That would not surprise you?
02:45PM A. No.
02:45PM Q. Okay. So you interview him on February 9th?
02:45PM A. Yes.
02:45PM Q. And you indict him on March 31st?
02:45PM A. I believe that's the date.
02:45PM Q. And then he is arrested on a warrant on April 8th?
02:45PM A. Yes.
02:45PM Q. So about two months or 60 days after you interview him, you arrest him?
02:45PM A. Yes.
02:45PM Q. And it doesn't surprise you that the video footage would be gone by then?
02:45PM A. I just know that businesses don't retain footage for very long in my --
02:45PM Q. And you did not obtain any security foot from Camillus House?
02:45PM A. No.
02:45PM Q. So there's no video footage that shows the room that you actually interrogated him in?
02:45PM A. No.
02:45PM Q. Or any of your interactions leading up to that?

02:45PM A. Not if they only keep it for 60 days.
02:45PM Q. Or any interactions after that?
02:45PM A. No.
02:45PM Q. Okay. So back to February 29th, you did use an audio recording, right?
02:46PM A. Yes.
02:46PM Q. You never told him he was free to leave?
02:46PM A. No, we did not.
02:46PM Q. Not before the interview?
02:46PM A. No.
02:46PM Q. Not during the recorded interview?
02:46PM A. No.
02:46PM Q. Okay. And you never provided him with a Miranda warning at any point?
02:46PM A. No, because he was not in custody.
02:46PM Q. So to be clear, neither Agent Hughes, nor -- I think you said his name was Max Duarte from USCIS -- neither of your colleagues provided him a Miranda warning?
02:46PM A. No.
02:46PM Q. No one provided him a Miranda warning?
02:46PM A. No.
02:46PM Q. So it is just the four of you in this office?
02:46PM A. Yes.
02:46PM Q. Okay. Three law enforcement agents?
02:46PM A. Yes.

02:46PM Q. And Mr. Renaud?
02:46PM A. Officer Duarte is not considered a law enforcement agent because he doesn't carry; but yes, he was with us.
02:46PM Q. Okay. It is not a large space, this office?
02:47PM A. It is an average office.
02:47PM Q. Does that mean, like, 12 feet by 12 feet?
02:47PM A. Roughly, yes.
02:47PM Q. Let's talk about the recording. I can play the recording if at any point you don't remember; so if that's the case, just let me know.
02:47PM A. Okay.
02:47PM Q. You asked Mr. Renaud his name?
02:47PM A. Yes.
02:47PM Q. How to pronounce his name?
02:47PM A. Yes.
02:47PM Q. And you asked him his immigration status?
02:47PM A. Yes.
02:47PM Q. And he told you he was a United States citizen?
02:47PM A. He said that he had applied for citizenship.
02:47PM Q. You want to hear the recording?
02:47PM A. Yes, please.
02:47PM Q. Okay. I am going to play for you what's been previously entered into evidence as Government Exhibit 2, and I am going to fast-forward to about one minute ten seconds. And I should probably turn the volume down.

02:48PM So I am going to hit play from 58 seconds, and we'll let this go for had a little more than a minute. Okay?

02:48PM A. Okay.

02:48PM Q. All right.

02:48PM (Audio played.)

02:50PM All right. So my question was: Did he tell you that he thought he was a citizen?

02:50PM A. I was referring to where he said he had applied and taken the test.

02:50PM Q. Okay. But you heard the same recording as I did, right?

02:50PM A. Yes.

02:50PM Q. So my question is: Did he tell you that he thought he was a citizen?

02:50PM A. Yes.

02:50PM Q. Okay. And your colleague from USCIS follows up and says: Have you taken the oath yet?

02:50PM A. Yes.

02:50PM Q. And he says: I haven't taken an oath, right?

02:50PM A. Yes.

02:50PM Q. And then your colleague from USCIS says: Then you're not a citizen? You heard that?

02:50PM A. Yes.

02:50PM Q. I'm going to go through the rest of the interview. I won't play it unless you have questions.

02:50PM So after this transpires, you ask him if he has ever voted?

A. Yes.
Q. One of the crimes that you're investigating him for is voting by alien?
A. Yes.
Q. And you understood that that question "Have you ever voted," was reasonably likely to elicit an incriminating response?
A. Yes.
Q. Because you had evidence that he had, in fact, voted; yet was not a citizen?
A. Yes.
Q. You also asked him if he registered to vote?
A. Yes.
Q. And you confronted him with various registration forms?
A. Yes, correct.
Q. And these forms ask, among other things, whether he is a United States citizen?
A. Yes.
Q. And you asked if he signed those forms?
A. Yes.
Q. And you asked if he read those forms?
A. Yes.
Q. And you asked if he filled out the information on those forms?
A. Yes.
Q. And you understood that those questions were also reasonably likely to elicit an incriminating response?

02:51PM A. Yes.
02:51PM Q. Because you had evidence that he was not a citizen at the time that those forms were apparently signed by him?
02:51PM A. Yes.
02:51PM Q. You never told him he was free to leave?
02:51PM A. No.
02:51PM Q. Your colleagues didn't either?
02:51PM A. No.
02:52PM Q. You never provided him Miranda warning?
02:52PM A. No.
02:52PM Q. Your colleagues did not either?
02:52PM A. No.
02:52PM Q. Your colleague actually tells him at the end of the interview multiple times that he is not a citizen; is that right?
02:52PM A. Yes.
02:52PM Q. And you told him that, too?
02:52PM A. I don't recall if I said that or not.
02:52PM Q. Did you tell him not to vote anymore?
02:52PM A. I don't -- I did not say that.
02:52PM Q. It was Agent Hughes that says that?
02:52PM A. I don't recall.
02:52PM Q. All right. Let's go to the end of the recording. I'm not sure. Agent Hughes is a female, correct? So if I'm getting the two of you confused, I apologize.
02:52PM A. Okay.

02:52PM (Audio played.)
02:52PM Q. All right. So I am going to play it from about 48 minutes, and we will just go to the end of it. Okay?
02:52PM A. Okay.
02:53PM (Audio played.)
02:53PM Q. I may have skipped too far ahead, but I don't want to waste your time.
02:53PM Max Duarte, that's when he says: Don't vote anymore, right?
02:53PM A. Correct.
02:54PM Q. And you don't specifically recall whether you or the other female agent said: Don't vote anymore?
02:54PM A. No.
02:54PM Q. But that exchange did as take place, right? You're not a citizen; don't vote anymore --
02:54PM A. Yes.
02:54PM Q. -- have a nice day? And then you leave. Okay. So let's talk about after the interrogation.
02:54PM May I have the ELMO back, please.
02:54PM Mr. Renaud keeps texting you; is that right?
02:54PM A. Yes.
02:54PM Q. Okay. So he's trying to send you documents, right?
02:54PM And at this point you understand that he's got a complicated immigration history?
02:54PM A. Yes.
02:54PM Q. And he is up front with you that he is confused by what's

going on?
A. Yes.
Q. And so he's trying to send you documents because he thinks you're trying to help him figure out what's going on with his status in this country, right?
A. Yeah. He had multiple different applications and petitions filed over the last few years; and with his different addresses and change of address, he was not quite sure if some of the documents, if he received them or not, from his filings.
Q. Okay. So he wanted to send you documents. And then he tells you, you know -- ultimately he reaches out later in the day on February 9th and says that he's having trouble sending it to you, right?
A. Yes, correct.
Q. And you realize that he's having trouble sending it to you -- and here I'm still showing you what's been previously admitted as Government Exhibit 1 and what has been previously marked as Defense Exhibit A -- more of the text message.
You realize that he can't send you the email because he doesn't have the "@" symbol in your email address, right?
A. Yes.
Q. So you tell him: Send it to ashley.r.olson@hsi.dhs.gov, and use the "@," right?
A. Yes.
Q. And that's what he does; he follows your directions, right?

And then what does he say in response?
A. Thanks. I owe you. Check your email now to see the documents and let me know if you have them. Thanks.
Q. And then what do you say?
A. I got an email from you but no documents. It's okay.
Q. And then on February 10th he reaches out to you again, and what does he say?
A. Good morning, Ashley. It will send the documents to you again in just a few. Thanks, Wilner. And have a blessed day.
Q. And how do you respond?
A. Thank you.
Q. And does he follow up with you?
A. Yes.
Q. What does he say?
A. Good afternoon, officer. Please check your email to get my documents to you. Thank you, and be blessed, Wilner.
Q. And that's at 12:40 p.m.
You don't respond, so he follows up again at 6:12 p.m.; do you see that?
A. Yes.
Q. What does he say at 6:12 p.m. on February 10th?
A. Hi, Ashley. Have you received my documents? If yes, please let me know. Thank you, Wilner.
Q. And do you respond to that?
A. Yes: Thank you.

02:57PM Q. And at that point you did get an email from him?
02:57PM A. Yes.
02:57PM Q. Okay. I'm showing you what's been previously marked as Defense Exhibit F. I believe this is the email that he sent to you. Can you read that first sentence, please.
02:57PM A. Hello, officer. First, thank you for your help. In this email are enclosed documents related to N-400.
02:58PM Q. Okay. Good. Thank you for your help; that's what he said?
02:58PM A. Yes.
02:58PM Q. Read the second paragraph for me.
02:58PM A. After my second interview with USCIS, on March the 25th, 2025, I received a continuance notice containing an assignment to complete and return no later than the 25th of October, 2025. I did it.
02:58PM Q. Okay. So it's helpful that you used to work for USCIS. I want to talk to you about this word assignment.
02:58PM Is it a simple process to become a naturalized United States citizen?
02:58PM A. Not necessarily.
02:58PM Q. It's complex, right? It involves a lot of back and forth between USCIS and the individual who wants to immigrate to this country?
02:58PM A. Depending on the situation, yes.
02:59PM Q. Okay. But USCIS, they give out assignments essentially, right?

A. If you don't have anything, all of the required documents once you go to take the test and do your interview, then yes, they could send out a request for evidence or a continuation if they need further documentation and where to make a decision.
Q. All right. So here he's telling you, right, that: I've previously received assignments from USCIS and these have been my responses?
A. Yes.
Q. Right. And this is the email he sends you after he is interrogated?
A. Yes.
Q. After you've told him how to work an email address?
A. Yes.
Q. Okay. And he sent you attachments to this email?
A. I believe so on this email.
Q. I'll show you some of them. So this has been marked as Defense Exhibit G. It's one of the attachments to that email.
And this is what I understand to be a letter that he sent to USCIS after they asked for additional information.
A. Yes, correct.
Q. Okay. Can you just read the first three lines on this paper?
A. Dear Honorable Officer, in response to N-400, application for naturalization -- then the receipt number pertaining to the specific N-400 -- thank you for your assignment to me. I have attached a copy of my response to you.

Q. Okay. So he received an assignment, a request for additional evidence from USCIS and he provided that?
A. Yes.
Q. Okay. And he sent that information to you as well?
A. Yes.
Q. I am going to show you another document that he attached to that email. It's been previously marked as Defense Exhibit H. This is a letter he sent to USCIS after he received a notice denying his N-400 application, correct?
A. Yes.
Q. Okay. Can you read this last paragraph for me, please, starting with: Following the instruction.
A. Following the instruction given in the notice, I do not only believe that I am eligible for a United States citizen after 32 years of living in this country, but I am also certified to be a U.S. citizen based on conduct and behavior. The denial decision notion emphasizes that I am lacked moral character to be a U.S. citizen, but arguably my records can prove the contrary. Henceforth, I appeal to you to examine my conduct and character to override this unstained denial. Thank you. [verbatim]
Q. Thank you. So he applied for naturalization, right?
A. Yes. He filed two different N-400 to apply.
Q. So just big picture; he applies for naturalization?
A. Yes.
Q. And he is told first: We need more information before we can

process your application?
A. Yes.
Q. He provides more information?
A. Yes.
Q. Then he is told: We're denying your application?
A. Yes.
Q. Okay. And he responds essentially saying: I think there has been a mistake?
A. Yes.
Q. Okay. And he writes this letter to USCIS in October 2025?
A. Yes.
Q. The: I think there has been a mistake letter?
A. Yes.
Q. And then in February 2026, so a few months later, Ashley Olson from the Department of Homeland Security comes by the homeless shelter where he is residing and wants to speak with him?
A. Yes.
Q. But you don't tell him that you're investigating him for a crime?
A. No.
Q. And so, you know, he's very forthcoming with you in the interview, right?
A. Yes.
Q. And at the end of it he sends you an email saying: Thank you for your help?

03:03PM A. Yes, because he was providing throughout the interview, he did have -- he keeps very good records, so he had all of the, you know, his paperwork in his briefcase. So when we were asking him questions about, you know, his immigration status and process, he was providing some things that he filed; so he said that he would send us everything that he had provided back to USCIS.
03:03PM Q. Right. So very forthcoming?
03:03PM A. Yes.
03:03PM Q. And then he thanks you for your help?
03:03PM A. Yes.
03:03PM Q. Okay. You know that he comes from Haiti, right?
03:04PM A. Yes.
03:04PM Q. Now, he's been in the United States for more than 30 years?
03:04PM A. Yes.
03:04PM Q. I think you understand that he wanted to avoid removal to Haiti?
03:04PM A. Yes.
03:04PM Q. Okay. As an agent from the Department of Homeland Security, part of your job involves understanding foreign threats to the United States, right?
03:04PM A. Yes.
03:04PM Q. So you're familiar with the current state of Haiti?
03:04PM A. Yes.
03:04PM Q. It's dangerous there, right?
03:04PM A. It is.

03:04PM Q. The State Department, they publish travel advisories; do you know that?
03:04PM A. Yes.
03:04PM Q. So this has been previously marked as Defense Exhibit I. They're just screenshots of the most recent travel advisory that's been published by the State Department.
03:05PM Does this look familiar to you?
03:05PM A. I have not seen this.
03:05PM Q. Okay. We'll go through it step by step. Up here at the top --
03:05PM MR. PIERCE: Your Honor, I am going to object to relevance.
03:05PM THE COURT: Overruled.
03:05PM BY MR. KUHL:
03:05PM Q. Up here at the top, what's the travel advisory dated April 16, 2026?
03:05PM A. Haiti Level 4. Do not travel.
03:05PM Q. So the State Department is saying do not travel to Haiti?
03:05PM A. Yes.
03:05PM Q. Right here, this highlighted paragraph, read that for me.
03:05PM A. Do not travel to Haiti due to the risk of crime, terrorism, kidnapping, unrest, and limited healthcare. Read the entire travel advisory.
03:05PM Q. Don't worry; I am not going to make you read the entire travel advisory into the record, but I do want to go through some of this

with you because I think it's important.

So read this highlighted paragraph here under the words: Advisory summary.

A. On July 27, 2023, the Department of State ordered nonemergency U.S. government employees and their family members to leave Haiti due to safety risks. Haiti has been under a national state of emergency since March of 2024. This state of emergency remains in effect.

Q. All right. So even though the travel advisory is dated April 2026, Haiti has been in a dangerous state for a long time before that?

A. Yes.

(Brief pause to confer with cocounsel.)

MR. KUHL: I'm will almost done, Your Honor, but Mr. Renaud needs to use the bathroom. But I promise I will be at a stopping point very quickly.

THE COURT: Okay.

BY MR. KUHL:

Q. So let me jump ahead here. Crime, can you read these highlighted portions from the State Department discussing crime in Haiti?

A. Violent crime is rampant in Haiti, especially in Port-au-Prince. The expansion of gang, organized crime, and terrorist activity has led to widespread violence. Crimes involving firearms are common. Crimes involving robbery,

carjackings, sexual assault, and kidnappings for ransom. The escalation of clashes between armed groups has led to a rise in sporadic gunfire incidents. There is a substantial risk of being struck by stray bullets, even for people not directly involved in the violence.

Local law enforcement has an extremely limited ability to respond to serious crimes, particularly outside of Port-au-Prince and Cap-Haitien.

Q. Thank you, agent.

Now, under kidnapping, can you read the first highlighted paragraph.

A. Kidnapping is widespread. U.S. citizen kidnapping victims have been hurt or killed.

Q. Let's go and jump ahead to unrest.

What does the State Department have to say? I've highlighted a portion for you.

A. Armed, antigang vigilante groups attack and in many cases have killed individuals, including U.S. citizens suspected of being gang members based only on rumors or incorrect information.

Q. And what does the State Department say about the state of healthcare in Haiti? Can you read that highlighted portion, please.

A. Hospitals and clinics in Haiti have limited trained staff and lack basic resources. Medical providers almost always require payment in cash before treatment.

03:08PM Q. You're aware that Mr. Renaud is in his 60s?
03:08PM A. Yes.
03:08PM Q. And you're aware that Camillus House provides health services to poor people, right?
03:08PM A. Yes.
03:08PM Q. So you understand that Mr. Renaud receives healthcare through a Catholic charity?
03:08PM A. Yes.
03:08PM Q. Under the section of advice for U.S. citizens, can you read this top tip from the State Department?
03:08PM A. Establish a proof of life protocol with your loved ones. If you are kidnapped, your loved ones will know specific questions (and answers) to ask the kidnappers to confirm that you are being held captive and are alive.
03:09PM Q. And then go ahead and read that last highlighted instruction.
03:09PM A. Prepare a will and any last instructions. Designate appropriate insurance beneficiaries or prepare a power of attorney.
03:09PM Q. So this is consistent with what you understand about the state of Haiti, right?
03:09PM A. Yes.
03:09PM Q. Prepare a will before you go there because there's a high likelihood that you will be killed?
03:09PM A. I'm just reading what is on here, yes.
03:09PM Q. Okay. So you understand why people want to avoid traveling to

Haiti?
A. Yes.
Q. You might want to avoid removal to that country. All right.
Last few questions. I want to ask you about the reports that you authored in this case.
I do think I have that correct. You are the agent who authored reports, right?
A. It says the author on there, so I am not sure if I did all of them.
Q. It says: Reported by Ashley Olson?
A. Yes, then that would be.
Q. So I've got the reports. If at any point you need to see it, just let me know. I just have a few questions.
In here you discuss an individual named Wilner Maurice Renaud A089253838?
A. Yes.
Q. I understand that that's his A number, correct?
A. Yes, correct.
Q. I also understand that his name is Wilner Renaud.
A. Yes.
Q. I haven't been able to find any documentation indicating that he has a middle name or any association with the name Maurice. Where did you get Maurice from?
A. I believe it was in his A file.
Q. It's in his A file?

A. I believe.
Q. So you believe his middle name is Maurice?
A. Yes.
Q. So his mull name is Wilner Maurice Renaud?
A. I believe so, yes.
Q. And that's based upon your review of his A file?
A. Yes, and other documents.
Q. Okay. Can you think of a specific document that says that?
A. It might be on the -- either the voter registration or his voting ballot as well.
Q. Okay. I'm going to read from the first page of your report. Under synopsis, this is how it starts: U.S. immigration and Customs Enforcement Homeland Security Investigations is committed to enforcing President Trump's Executive Order 14248 titled, quote: Preserving and protecting the integrity of American elections and to the protection of established federal laws in the United States Constitution.
Now, it says this several times. Every time you start a report entry, that's the sentence that it begins?
A. Yes.
Q. You know, I've looked at a lot of these reports over my career. Typically they don't start out this way.
So why did you choose to mention an executive order at the beginning of this report?
A. Because that is the direction that we received.

03:12PM Q. You were told by a superior that this language needs to be at the top of every report?
03:12PM A. Yes, for voter fraud investigation cases.
03:12PM Q. But this is not typical of the practice of Homeland Security investigators; to mention the laws that they're working under?
03:12PM A. We can. It's just any synopsis for the basis of the case; so depending on what group, what type of case you're investigating, it can vary, and depending on the supervisor and their requirements for what they like to see, it will just depend.
03:13PM Q. Okay. So your supervisor likes to see this language in there?
03:13PM A. Yes.
03:13PM Q. And you were told to put it in there by your supervisor?
03:13PM A. They just wanted to be clear for the specific types of cases that we are working that this was an executive order.
03:13PM Q. Okay. So you've been investigating voting fraud for a while, right?
03:13PM A. Yes.
03:13PM Q. Who won the 2020 presidential election?
03:13PM MR. PIERCE: Objection to relevance.
03:13PM THE COURT: Let him finish the question.
03:13PM THE WITNESS: I do not recall.
03:13PM BY MR. KUHL:
03:13PM Q. Who won the 2020 presidential election?
03:13PM A. I forget his name.
03:13PM Q. I'm sorry?

A. I forget his name.
Q. Who won the 2020 presidential election?
A. I don't recall his name.
Q. Who was the president before the current president of the United States?
A. I don't recall his name.
Q. You don't recall who was the 46th president of the United States?
A. No. It's not coming to me right now.
Q. Joseph R. Biden?
A. Biden, yes. Sorry.
Q. Okay. Who won the 2020 presidential election?
A. Joseph Biden.
Q. Okay. And was that win the product of fraud?
A. I'm sorry, I don't understand the question.
Q. Okay. The 2020 presidential election, you testified that Joe Biden won, correct?
A. Correct.
Q. Joe Biden's win, was that the product of voter fraud?
A. I was not an agent at that time; at the beginning of that administration.
Q. Do you believe that he legitimately won the 2020 presidential election?
MR. PIERCE: Objection to relevance, Your Honor. And argumentative.

THE COURT: Overruled.

THE WITNESS: I'm not very into politics.

BY MR. KUHL:

Q. You're an investigator from the Department of Homeland Security who specializes in voter fraud. I think you're interest in politics is irrelevant.

The question is: Do you believe that Joe Biden legitimately won the 2020 presidential election?

MR. PIERCE: Objection. Asked and answer.

THE COURT: It wasn't answered, sir. Overruled.

THE WITNESS: I'm not sure.

THE COURT: I'm sorry, ma'am. You can't talk over me. He asked a question; there was an objection; I have to rule on the objection.

I have overruled it. You can answer the question now.

THE WITNESS: Sorry, Your Honor. I'm not sure.

BY MR. KUHL:

Q. You're not sure that Joe Biden legitimately won the 2020 presidential election?

A. I mean according to the polls, he won.

MR. KUHL: No further questions.

THE COURT: Any redirect?

MR. PIERCE: Yes, Your Honor. I don't know if you wanted to take a break for Mr. Renaud to use the restroom.

MR. KUHL: If we could, I would appreciate that, Your

Honor.

THE COURT: That would be great. Let's do that. The marshals can take him to the restroom.

(Recess at 3:15 p.m.)

(Back on the record at 3:22 p.m.)

THE COURT: You may continue.

REDIRECT EXAMINATION

BY MR. PIERCE:

Q. Hi, Agent Olson.

A. Hi.

Q. So when you went and dropped off your business card looking for Mr. Renaud, the defendant, was he living there at the time?

A. He was reporting there according to the records approximately every few weeks.

Q. I'm sorry, how long? How often?

A. Every few weeks.

Q. And when you -- let's move now to the questions that you were asked about the voter registration forms and him voting.

When you asked and confronted him with the voter registration forms, did you know for a fact that he was the one that signed those forms?

A. No.

Q. It was only after he said that those were the forms that he signed that you knew that, in fact, he had signed those?

A. Yes.

Q. And what about voting? Did you know for a fact that he had actually gone and voted?
A. There is a voting in person record; so I believe his ID would have had to have been checked; but again, I couldn't confirm that. It was just the signature on there.
Q. So the purpose of the interview then was then to determine whether or not it was Mr. Renaud that had committed this offense, correct?
A. Yes.
Q. Or whether someone else had used his identity to commit the offense, right?
A. Yes.
Q. But at the time that you were interviewing him, you had no idea which way this was going, correct?
A. Correct.
Q. So you had to conduct this investigation and interview him?
A. Yes.
Q. And after the interview was conducted, did you do more investigation into Mr. Renaud's criminal -- immigration history?
A. Yes.
Q. And what did you review as a follow up to determine whether or not he was a citizen of the United States or not?
A. We were able to go in and review his N-400 application for naturalization filings and all the supporting documentation.
Q. Now, you said that Mr. Renaud had shown you documents out of a

03:24PM briefcase; is that correct?
03:24PM A. Yes.
03:24PM Q. How would you describe Mr. Renaud's ability --
03:24PM Or how would you describe Mr. Renaud's recordkeeping based on your observations?
03:24PM A. He seemed very organized. He had everything in a briefcase. He said he brought it along with him just so he didn't lose anything or it wouldn't get stolen.
03:24PM Q. And Mr. Renaud entered the United States back in 1993; is that right?
03:24PM A. Yes.
03:24PM Q. And had he filed any other applications successfully with USCIS through your investigation?
03:24PM A. Yes.
03:24PM Q. Such as an I-130, correct?
03:24PM A. Yes.
03:24PM Q. Which is a petition for alien relative?
03:24PM A. Yes.
03:24PM Q. And he went through the process of adjusting his status; is that correct?
03:24PM A. Yes. He then filed an I-45 to adjust his status; then he also had to file a 751 petition to remove conditions of his resident status.
03:25PM Q. Did he do that?
03:25PM A. Yes.

03:25PM Q. And did you encounter any other documents when he tried to remove the conditions of his residence?
03:25PM A. Yes. It was just, you know, the criminal history background and other supporting documents that he had committed.
03:25PM Q. Did USCIS send any correspondence to the defendant?
03:25PM A. Yes.
03:25PM Q. Did they request more evidence?
03:25PM A. Yes.
03:25PM Q. Now, you were asked on direct whether immigration is -- the process of becoming a naturalized U.S. citizen is complicated, right?
03:25PM A. Yes.
03:25PM Q. And you had said that it can be, correct?
03:25PM A. Correct.
03:25PM Q. Or that it was -- I don't remember exactly what you said; but in essence, yes?
03:25PM A. Depending on the situation, it could be, yes.
03:25PM Q. What is one thing that an individual is supposed to always do when they are filing documents? What's one of the most important things that they can do to ensure that they receive correspondence from USCIS over the course of their immigration process?
03:25PM A. It's a requirement to file an AR-11 change of address form in order to make sure if they're moving addresses that they receive the documents.
03:26PM Q. So if somebody changes their address, it is their obligation

to do so, correct?
A. Correct.
Q. So ensure that they receive all the documents from USCIS so that they don't miss anything?
A. Yes, correct.
Q. And over the course of your training and experience and working at USCIS, has it become more complicated when people don't update their address?
A. Yes.
Q. And if people keep their address updated, are they able to more fluidly move through the immigration system?
A. Yes.
Q. You were asked some questions about people who do not want to be removed back to their home country; specifically, Haiti?
A. Yes.
Q. Do you gauge your investigations on where someone could possibly be removed if they're not a United States citizen?
A. No.
MR. PIERCE: I have nothing further, Your Honor.
THE COURT: All right. Thank you very much, agent.
(The witness is excused.)
THE COURT: Call your next witness.
MR. PIERCE: No further witnesses, Your Honor.
THE COURT: All right. Let's proceed to argument.
MR. KUHL: Actually, Judge, we have a witness we would

like to call. It will be brief.

THE COURT: My apologies. Absolutely.

MR. KUHL: Your Honor, the defense calls Kenneth Veloz.

THE COURTROOM DEPUTY: Please raise your right hand.

(The witness is sworn.)

THE WITNESS: Yes, ma'am, I do.

THE COURTROOM DEPUTY: Please state your name and spell it for the record.

THE WITNESS: My name is Kenneth Veloz. The last name is V as in Victor, e-l-o-z.

KENNETH VELOZ,

Defendant's witness, first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. KUHL:

Q. Good afternoon, Mr. Veloz.

A. Good afternoon.

Q. Can you please tell me where you work?

A. I currently work as an investigator with the Federal Public Defender's office.

Q. So we work together; is that right?

A. Yes, sir.

Q. Prior to working as an investigator with the Federal Public Defender's office, what did you do for a living?

A. I worked 30 years in law enforcement. I worked with Miami-Dade. I was a 28-year detective, and then I was detached to

03:28PM a task force with ATF that's called the stop unit; so basically the last 13 years, we just did federal indictments.
03:29PM Q. So you have a long history of law enforcement experience at both the state and federal level?
03:29PM A. That's correct.
03:29PM Q. This past Friday did you and I travel to Camillus House together?
03:29PM A. Yes.
03:29PM Q. Okay. Did we park outside of the entrance?
03:29PM A. Yes.
03:29PM Q. Okay. What kind of vehicle did we park behind?
03:29PM A. A City of Miami off-duty officer. They always have off-duty officers in front of that location since I was an officer.
03:29PM Q. And what kind of vehicle were we in?
03:29PM A. We were in a unmarked government vehicle with government tags in the front and in the back.
03:29PM Q. So did the police officer let us park right behind him in the fire lane?
03:29PM A. Yes. Well, it's all coned off, so we had to ask permission from the officer to allow us to park there.
03:29PM Q. And once we parked there, were we approached by anyone that worked at Camillus House?
03:30PM A. Yes. A gentleman approached us, one of the security guards.
03:30PM Q. Is that a uniformed security guard?
03:30PM A. Yes.

03:30PM Q. Okay. And did you identify yourself?
03:30PM A. Yes, I did.
03:30PM Q. How did you identify yourself?
03:30PM A. I showed him my credentials.
03:30PM Q. So he understood that you were an investigator with the federal government?
03:30PM A. Yes.
03:30PM Q. And did we explain why we were there?
03:30PM A. Yes, we did. In fact, I also provided him with a business card.
03:30PM Q. And how did he respond to that?
03:30PM A. He asked that -- he didn't have the authority to help us with what we needed, so he called his executive security or director of security for Camillus House, and he came down and met with us.
03:30PM Q. Was that Rick Gonzalez?
03:30PM A. Rick Gonzalez, yes.
03:30PM Q. And so again did we tell him who we were?
03:30PM A. Yes.
03:30PM Q. And was he keen to let us inside the building?
03:30PM A. Yes. He gave us -- he says he can give us a tour; his words.
03:31PM Q. But beyond giving us a tour, was he willing to give us anything else?
03:31PM A. No. He was a little hesitant at first because of he wanted to keep the privacy of the tenants in the place. He just asked that we take no videos or photographs of the location.

03:31PM Q. Would he give us any information about any of the residents?
03:31PM A. No.
03:31PM Q. Would he give us any of the security footage?
03:31PM A. No. They only retained them I want to say 60 days he said.
03:31PM Q. Right. But my question I guess was more to the point of if we wanted security footage, would he give it to us simply because we asked?
03:31PM A. I understand your questioning now.
03:31PM No, he said we would need a search warrant to get the videos. However, he said the footage wouldn't be available for the particular date that we requested because they only retain it for, I think, 60 or 90 days. I don't recall exactly how many days.
03:32PM Q. So he gave us a tour of the ground floor of the building; is that right?
03:32PM A. Yes.
03:32PM Q. What did we see on this tour? Walk me through it.
03:32PM A. Well, when you first come in, there's metal detectors. Start from there?
03:32PM Q. Yes, please.
03:32PM A. There's metal detectors, so you can't get into the facility unless you go through the metal detectors where there is security there. And then once you go through there, you have the option to turn immediately right to go into the lobby area where you would meet with employees that you have to come in and register with; or

03:32PM you can go straight into the courtyard area, and there's other rooms there, like prayer rooms, libraries, and stuff.
03:32PM Q. We explained to him that we were concerned with an interrogation that occurred on February 9, 2026; is that right?
03:32PM A. Yes.
03:32PM Q. And we specifically asked him what rooms on the ground floor in the facility could fit that description?
03:33PM A. Yes.
03:33PM Q. And so he took us around looking at various spaces where this interrogation could have taken place; is that right?
03:33PM A. Yes. But he basically narrowed it down to one particular room more or less, and he gave us the reasons why as he gave us the tour of these rooms.
03:33PM Q. Okay. So he said it wouldn't be in the courtyard, right?
03:33PM A. It wouldn't be in the courtyard. It wouldn't be in the prayer room because that's a time where the tenants have their own quiet time for prayer and stuff. And in the library is quiet time there and people go in and read books; as, in fact, when we were there, there were people in the rooms.
03:33PM Q. So there was really only one space that he thought based upon our description it could have been?
03:33PM A. Yes.
03:33PM Q. Did he show us that space?
03:33PM A. Yes.
03:33PM Q. Okay. Where was that space?

03:33PM A. That place was when you go -- we had to go through the metal detectors, but it's a building not into the actual lobby; so we didn't -- before going into the courtyard, it's that right-hand turn that I was talking about. You go in through these glass doors and there is a big counter in the front, and it's -- basically that's where -- it seems to me, and I don't know for sure, but I think that's where people go in to actually register and get settled in and get assigned places.
03:34PM Q. So you remember you walk into the lobby and straight ahead of you is this big desk with employees sitting at it, right?
03:34PM A. Yes.
03:34PM Q. And so if you're looking at the desk, is the office space where he thought this could have happened, was it to your left?
03:34PM A. Yes.
03:34PM Q. Okay. Before I talk about that office space, I want to ask you if you remember what was behind the secretary's desk. Do you remember there being a hallway there?
03:35PM A. So behind the secretary's desk, I don't think we had access to that. I don't remember. There were doors, but I don't remember the hallways, no.
03:35PM Q. Was it your understanding that behind the secretary's desk was an employee's only area --
03:35PM A. Yes.
03:35PM Q. -- that was closed with a door?
03:35PM A. Yes.

03:35PM Q. And the door had a sign on it?
03:35PM A. Yes.
03:35PM Q. And did Mr. Gonzalez advise that it couldn't have happened back there because nobody would let us back there or nobody would let them back there I should say?
03:35PM A. That's correct.
03:35PM Q. So he thought it's probably this office space that's right here that's adjacent to the lobby?
03:35PM A. Yes. So once you go into that lobby room, you go through the doors, it's on your immediate left; there is a room there with a glass door. It's like a 12-by-12 room, and it's got one window that faces the metal detectors but had, like, some shades and a big cardboard of like scheduling or something covering the window.
03:36PM Q. Okay. And so there's two solid walls; one has a window to the exterior; and then there is two other walls. And what were those walls made out of?
03:36PM A. They were just regular walls. There was a glass door and then there was a wall with another door.
03:36PM Q. Right. I'm asking so there's two solid walls and then there's two glass walls, right?
03:36PM A. Correct.
03:36PM Q. And the glass walls, did they have shades on them?
03:36PM A. Yes.
03:36PM Q. Okay. Do you remember inside that room whether there was a security camera?

03:36PM A. Yes.
03:36PM Q. Okay. Was there a security camera inside that room?
03:36PM A. Yes, there was.
03:36PM Q. If someone were interrogated in that room, would the security camera probably have been able to see it?
03:36PM A. If they were functioning that day, yes.
03:36PM Q. And he told you that there was a 60-day video retention policy?
03:36PM A. He said 60 or 90. I can't remember exactly; but yes, he said that there is limited; and, in fact, that it wouldn't be accessible to us because it records over it after 60 to 90 days.
03:37PM Q. Okay. That's okay.
03:37PM So, look, based upon what you've learned about this interrogation, in addition to your training and experience in law enforcement, would you have provided Mr. Renaud with a Miranda warning for questioning him like the agents in this case?
03:37PM A. Absolutely. I reviewed the interview on the 16th and I actually listened to it this morning. And if I'm conducting an interview for the purpose of arresting someone or making that decision, to me it's clear there it's a custodial interview just based on the contents that was spoken during that interview.
03:37PM Everything under the sun was asked, including about his previous relationships during his divorce, talked about documents, talked about signatures, talked about his examinations that he took to become a citizen. And Mr. Renaud explained to them that

03:38PM he had passed. The agent said that: Because you passed doesn't mean you are a citizen until you're actually sworn in.

03:38PM I know if I'm about to -- if I'm taking these steps to indict somebody, you do everything correctly; you basically ask the right questions; you were thorough about the documentations, but you missed a very important first step, which is the Miranda rights.

03:38PM And besides, even -- even when you sit down and speak to them, if you do decide not to read the Miranda, normally it would be: Hello. My name is so-and-so. I'm here because of this reason. You're not under arrest at this moment. You're free to leave at any time, but we have some questions for you. Unless there was a preinterview prior to the recording that took place during there in that office, that was a little concerning for me.

03:39PM MR. KUHL: Thank you. No further questions.

03:39PM THE COURT: Any cross-examination?

03:39PM MR. PIERCE: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. PIERCE:

03:39PM Q. Good afternoon.

03:39PM A. Good afternoon.

03:39PM Q. So it is your experience as a law enforcement officer, you know that you can interview people to gather information, correct?

03:39PM A. Correct.

03:39PM Q. Gather information to build a case?

03:39PM A. Yes.
03:39PM Q. Gather information to possibly identify a suspect, correct?
03:39PM A. Yes.
03:39PM Q. Or to identify other suspects?
03:39PM A. Yes.
03:39PM Q. So -- and there's also circumstances I'm sure over the course of your law enforcement career in which you have never Mirandized an individual prior to interviewing them; is that correct?
03:40PM A. Yes.
03:40PM Q. There were certain circumstances in which you didn't feel they were in custody, correct?
03:40PM A. Yes. But in this circumstance with the amount of evidence that was during this interview, this is not your just typical, you know, reasonable suspicious contact with an individual who you're speaking to. You have -- basically the case is pretty much solidified.
03:40PM Q. Did you review the evidence and reports in this case?
03:40PM A. Yes.
03:40PM Q. Did you find any evidence in your review of the evidence in this case that shows that they knew for certain that Mr. Renaud had signed those registration forms?
03:40PM A. Well, when you compare -- my answer to that is yes, and I will tell you why.
03:40PM I took it upon myself to review his driver's license signatures, and I compared it to what our client confessed to or

told the agents during the interview that that was his signature.
Q. But was there anything in the reports or the evidence that you reviewed that showed that there was concrete evidence that he had actually signed those forms?
A. No.
Q. Was there any concrete evidence in the reports that you reviewed that showed that Mr. Renaud was actually at the voting location and signed for and actually voted in 2020?
A. No. I can say that, again, I am not a hand -- I am not a hand expert or anything like that, but one of the things that I would do during my investigations is obtain what I do have and compare it to the evidence. And again, because the signature was a unique signature and you look at the voter's registration card and you look at his Florida driver's license or Florida ID card, they're very much alike.
So thinking and knowing that this is -- could be or, you know, your subject and you do believe that you have enough to charge him, which I believe they did, I would have read him Miranda rights.
Q. Now, in reviewing the evidence in this case, you reviewed all of the voter registration forms, correct?
A. Well, I went over several of the exhibits.
Q. Did you review all of the voter registration forms?
A. I would say there was about five or six of them I went over.
Q. And Mr. Renaud is charged with only four counts of filling out

voter registration forms and claiming to be a United States citizen, correct?
A. Yes.
Q. Because on one of those forms the signatures didn't match; is that correct?
A. Yes, that was on the first page on the small little square box on the bottom right-hand side.
Q. And it was actually Mr. Renaud during his interview that said: That's not my signature?
A. That's correct.
Q. Okay. And he wasn't charged for that, correct?
A. Yes. Well, I would say I'm assuming that that is the document we're talking about because during the interview the agents didn't particularly say what exhibit they were talking about or what page number on the bottom right-hand side; but I am assuming you're talking about the first page on one of the voter's registrations.
Q. So it wasn't until more information was gathered that the detective or the agent in this case was able to determine this is the form that Mr. Renaud signed; this is one that he has not signed?
A. He admitted to that, yes.
Q. Now, you're also aware during your time as a law enforcement officer and an investigator that there are a variety of different things in which an officer should or should not do when they're interviewing somebody and they're not Mirandizing them; is that

right?
A. Repeat the question.
Q. During your time as a law enforcement officer and your time as an investigator, you know that there are certain things that officers should or should not do if they're not going to read Miranda to someone they're going to interview; is that right?
A. Yes.
Q. Such as display a weapon?
A. Yes, correct.
Q. They should not display a weapon, correct?
A. When you say "display," you're saying that visibly visible on -- in their holster?
Q. Correct.
A. We try to avoid that.
Q. Why do you do that?
A. Because we don't want to show any intimidation factor.
Q. Is there any evidence to show that that happened in this case?
A. I don't know if they were armed or not. No, the videos were not available.
But one thing I wouldn't do also is if I'm not going to read Miranda, I wouldn't interview someone in a 12-by-12 room with three officers. That's definitely a problem for us.
Q. But --
A. And we are trained also as law enforcement not to do so.
Q. But they didn't interview Mr. Renaud at the police station,

correct?
A. That's correct.
Q. They didn't interview him in a place that he wasn't familiar with, correct?
A. I don't believe so. I believe he was residing there or visiting.
Q. They're familiar with Camillus House, correct; as a homeless individual who goes there, receives services, correct?
A. Yeah, I am assuming so, yes.
Q. Did you listen to the entirety of the audio interview?
A. Yes.
Q. Did it ever become confrontational in its tone?
A. No.
Q. And as a law enforcement officer, you're trained not to get confrontational if you're not going to read the Miranda, correct?
A. I would have never conducted this interview without Miranda.
Q. My question is: When you're not reading someone Miranda, you don't want to elevate the tone in a confrontational way because they could deem that they're not free to leave at that point; is that right?
A. Yes. But that's not my style anyways.
Q. Well -- I'll strike that.
When you went to Camillus House on February 9th, did you speak to anyone at the front desk who worked there?
Or when you went to Camillus House last Friday, sorry, did

03:46PM you speak to anybody who worked there on February 9th?
03:46PM A. Yes.
03:46PM Q. And who was that?
03:46PM A. That was the first security guard that we made contact with and the supervisor.
03:46PM Q. They said that they were working there on February 9th?
03:46PM A. Oh, no. No.
03:46PM Q. No?
03:46PM A. In fact, the supervisor didn't remember. We provided him with the name of our client, and he didn't recall.
03:46PM Q. So when you spoke to Rick Gonzalez, he actually wasn't there when the agent interviewed Mr. Renaud on February 9th; is that right?
03:46PM A. Yes. According to him, he doesn't remember that.
03:46PM Q. Doesn't remember. You didn't speak to the front desk person who worked on February 9th who allowed the agent to go into -- the agents to go into the office with Mr. Renaud, did you?
03:46PM A. No.
03:46PM Q. So you don't know exactly which office they went into?
03:46PM A. No, I do not.
03:46PM Q. And you didn't do a full complete tour of the first floor of Camillus House to be able to tell us which office they could or couldn't have been in?
03:46PM A. Well, according to the supervisor again, Rick Gonzalez, he
03:47PM told us that he would never allow anyone to interview anyone in

03:47PM the rooms that were available, and he showed us which rooms they were; and that anytime that there were issues where someone needed to be spoken to, that was the office that was being utilized.

03:47PM Q. You said on direct that there were certain places in which interviews could happen; is that right?

03:47PM A. I mean, you can do it on the exterior part of the -- you could do it in the courtyard where there's benches there, but it's open; it's open to where other people gather and have lunch and stuff like that.

03:47PM You can do it outside of the metal detectors where there is little seating areas outside. But other than --

03:47PM Q. You can -- sorry. I didn't mean to interrupt.

03:47PM A. But other than outside, we didn't see any actual office or any other structure where the interview could have taken place.

03:47PM Now, I'm not saying it didn't because we don't know that for sure, but that's what the supervisor was telling us.

03:48PM MR. PIERCE: I have nothing further.

03:48PM THE COURT: All right. Anything else? Redirect?

03:48PM MR. KUHL: No thank you, Your Honor.

03:48PM THE COURT: Any other witnesses on behalf of the defendant?

03:48PM MR. KUHL: No.

03:48PM THE COURT: All right. Thank you very much, sir.

03:48PM THE WITNESS: Thank you, Your Honor.

03:48PM (The witness is excused.)

03:48PM THE COURT: All right. Let's proceed to oral argument. I'll hear first from the defense.

03:48PM MR. KUHL: Thank you, Your Honor.

03:48PM So there is no dispute that there is no Miranda warning provided, and there is really no dispute that an interrogation occurred. I think under the Innis test even Agent Olson admitted that she knew her questions were reasonably likely to elicit an incriminating response; and indeed they were.

03:48PM So Your Honor is really only being asked to decide whether Mr. Renaud was in custody at the time of this unwarned interrogation. So let's turn to the totality of the circumstances to assess how close our case is to the classic incommunicado station house interrogation. I think there are several reasons that this is close enough to the coercive environment animating the Miranda opinion for a warning to be required.

03:49PM So first, right, Mr. Renaud is in an enclosed space that resembles an interrogation room. I know we have had some debate back and forth about what exactly that room looked like, where it is positioned. Your Honor heard from Agent Olson that she thinks it was behind the security desk somewhere. We're proposing it is to the left of the security desk. You know, it's a question of memory. And I think Your Honor heard that there's parts of Agent Olson's memory that are curiously missing.

03:49PM But full stop, everyone agrees he is in an enclosed space, right. The door is closed, there's three law enforcement

officers, he's by himself, and it is this incommunicado interrogation room that is classic in Miranda, right.

You know, maybe the room has windows. And the government's telling the room has one window that looks into the interior of a hallway where members of the public are not allowed to travel. In our view it's adjacent to the lobby but there are obstructions that prevent people from looking into the room. The case that the government cites, Woodson, its involves a case where an individual was brought into a police van outside of his home. There's a whole bunch of circumstances there that led the Eleventh Circuit to conclude essentially, you know, this person would feel free to leave; including the fact that that individual's brother had been questioned in the same police van 15 minutes prior for 15 minutes prior to this interrogation and was allowed to leave. That's not the case here.

He is not in a police van; he is in an office space that resembles an interrogation room. You know, down to the last detail almost; there's a few chairs, a desk, and a security camera on the wall. Very much a classic interrogation room in which he is outnumbered by law enforcement three to one.

Two of those law enforcement agents had weapons. Whether Mr. Renaud saw them or not, it's unclear in the record. I mean guns are large, and so it's very reasonable that he could have ascertained that they do indeed have guns. I don't know how they are at hiding it. But again, the timeline here of interrogation

03:51PM and then indicting a month and a half later and then arresting, you know, weeks after -- more than a week after that, just don't have an opportunity to get the video footage to kind of vet that fact.

But we know they had guns, and we know he's not told that he's free to leave. And we know that if he did leave, not only does he have to get past the security guard at the security checkpoint, but he also has to get past the off duty officer in the police car outside of Camillus House, so there's layers of exit that he would have to go through.

Another point to consider, the questioning here; distinctly accusatory. So he's essentially told that he's not a citizen, and then they walk him through his self-incriminations step by step. Did you -- you know: You're not a citizen. Have you voted? Right. Have you registered to vote? Did you sign this form? Did you fill out this form? Is that your signature right there? Right. They're walking him through step by step what they need to prove their case.

And the distinctly accusatory nature, this matters, Your Honor, because the Eleventh Circuit in United States vs. Jayyousi, 657 F.3d 1085, 1110, Eleventh Circuit, 2011, Jayyousi, it's a border search case, so it's not on all fours. But the thing that makes the border search case rise to the level of a custodial interrogation is the fact that the questioning gets distinctly accusatory; and here it is essentially that the entire time.

03:53PM Another factor to consider is that the agents did not coordinate the interrogation through the Catholic charity providing services to Mr. Renaud, right. Instead to avoid interference from the staff at Camillus House, they don't go through the director of security; they just reach out to him independently and try to set up this meeting where he's never told: This is a criminal investigation. We are not trying to help you with your naturalization application. So there is some misdirection and an intentional effort by law enforcement to create more of an incommunicado environment, which is ultimately the environment he is in when he's questioned.

03:53PM The last thing I think of relevance is just the risk 03:54PM associated with removal to Haiti. There is really no dispute about the state of the country at this point. I think Your Honor after her recent trial schedule probably understands what's going on in that country a lot better than I do.

03:54PM There is an element here that's analogous to physical coercion because removing someone to a country like Haiti is really seriously a genuine threat of physical violence. Even if you're minding your own business and doing nothing wrong, you could get struck by a stray bullet because gang violence is just rampant; poverty is rampant. And, I mean, it's not a place an individual would want to be; especially not a place that an individual would want to be after they have built a life in the 03:55PM United States for more than 30 years.

03:55PM And so taking all of these things considered, I know it's not an interrogation at the station house; but when you add in these other circumstances, I think it builds to a point where a Miranda warning is required because this individual is in custody and he's being interrogated. And, you know, this isn't the type of case where suppressing the statement is going to erase all of the evidence that the government could bring to the table.

03:55PM But the government has an obligation here. If they're going to wear the white hats and they're going to come in here and prosecute Mr. Renaud for what they say is a crime, they have an obligation to play by the rules when they do that. And here the rules are you need to tell someone in advance of a custodial interrogation that they have the right to remain silent; they have the right to have an attorney present during questioning; if they can't afford one, a lawyer will be provided for them because at the end of the day, anything they say can and will be used against them.

03:56PM And so here that didn't happen and we know -- we know that this coercive environment worked because at the end of the day Mr. Renaud says: Thank you for your help. Agent Olson is not trying to help him; she is trying to get him to incriminate himself so she can prosecute him for a crime. And it's not -- I mean, that's not dispositive because Mr. Renaud's subjective beliefs don't matter here, right. It's an objective test. It's: What would the reasonable person think under these scenarios?

And given everything I have discussed, the reasonable person, upon hearing these kinds of questions, being told: You're not a citizen; and then being asked: Did you vote? Did you sign this? Did you sign this thing that said you're a United States citizen even though I just told you you're not, a reasonable person understands in that scenario that they're in big trouble. This is not some attempt to sort out, you know, what's going on with my immigration case; why did I receive a notice that my naturalization was denied. No. This is something totally different.

This is an investigation for criminal conduct, and he was not warned that that's what the whole purpose of this meeting was. I mean, the Department of Homeland Security includes within it both Homeland Security Investigations where Agent Olson is from and USCIS. There is a person from USCIS in the room. If they wanted to craft a ruse in which they think they can get this guy to be forthcoming with them by misrepresenting or at least not disclosing the real purpose of their visit, maybe that worked for Mr. Renaud; but for the reasonable person, it wouldn't because the reasonable person would understand under these circumstances that they're in trouble; they're not free to leave.

And so they're in custody, and for these reasons, Your Honor, I think we have got an unwarranted custodial interrogation. I ask you to suppress the interrogation.

THE COURT: Let's walk through some of these things

because some of these things don't go to the question at hand.

So the threat of the removal to Haiti, that goes to maybe your client's state of mind because he doesn't want to go back to Haiti. I am going to have to listen to the entire interview, of course, but was there ever a part of the interview where he was told: If you don't talk to us, we're going to deport you back to Haiti? Because it seems to me that that's where the threat would be coercive. Those aren't the facts here, correct?

MR. KUHL: Not in the recorded statement, Your Honor.

THE COURT: Do you have any reason to think it was said at all?

MR. KUHL: I asked Agent Olson what the conversation she had had leading up to him was; she advised the purpose of their visit. I think Your Honor could draw an inference from the fact that he is sending her all of these documentations about his naturalization, all of the production that he's making to her about what's going on with his immigration case, to conclude that there must have been some sort of suggestion that they were going to help him. But the line of cases concerning promises in this environment, my understanding is it's really more about if you give the Miranda warning, are you undermining it by saying stuff like that.

I think what I'm getting at here is that, you know, the reasonable person would understand that the stakes are ultimately at the end of the day removal to a country that is very dangerous.

03:59PM THE COURT: But there was never any back-and-forth where he is told, you know: You're going to be deported to Haiti unless you help us. That's more the akin, right, of the line of cases that we're more familiar with of when something is promised of that nature. But it didn't seem like that happened here.

03:59PM Nor was he told: You have to cooperate with us so that you won't get deported. Or: You know you're going to be deported to Haiti. That's not in the conversation?

04:00PM MR. KUHL: No, not specifically in the recorded conversation, Your Honor. But again, you know, he's been dealing with USCIS since it was called NIS.

04:00PM THE COURT: No, I am going to get there, but I don't see it. Again, I have to listen to the whole audio because that wasn't played today, but it doesn't seem like from what I've read and the questions I've heard that that's where this is going.

04:00PM I'm not sure how the fact that you have to go through security to get in -- you certainly don't have to go through security to get out.

04:00PM I think the questions being accusatory in nature, that goes to whether or not this was an interrogation, right. We go back to whether he was free to leave.

04:00PM I don't think the presence of the three officers alone is sufficient.

04:00PM What this is sounding like to me from the evidence I'm hearing, and I don't know if this really helps the government or

04:00PM not, which is it sounds like you've got the government coming in to talk to him; it's a branch of the government that this defendant has been communicating with. Now, granted the agency has various parts. But this defendant is communicating with that agency for purposes of having some sort of resolution to his immigration situation.

The agents show up. It sounds like he thought they were with him, right. It sounds like he thought they were there to help him based on earlier correspondence. Of course they weren't.

Where does that leave me if that's where we're at? Because then it goes back to sort of them tricking him. I'm not saying that they tricked him on purpose, but it goes back to them, your best-case scenario is you have agents showing up; they have done some diligence in their records; they might have seen that this defendant was in fact communicating with the agency about an immigration issue; they brought somebody with them from that part of the agency, right. And so where are we left if that's what the government did?

MR. KUHL: Well, I mean, I would first start: I respectfully disagree that the distinctly accusatory nature goes only to whether it's an interrogation or not.

THE COURT: Okay.

MR. KUHL: Again the case Jayyousi, 657 F.3d 1085, Jayyousi, the Eleventh Circuit specifically says that it's the distinctly accusatory nature of the language that goes to custody

because a person hearing questions that are distinctly accusatory triggers in their mind that they're not free to leave.

THE COURT: I will have to see what those questions are because I'm not sure, at least from what I heard, but I haven't heard the whole thing, that it rises to that level. I could be wrong, but it didn't seem like that they were like peppering him that way; but again, I will listen to the whole thing.

So, all right. So you think that the nature of the questions goes to free to leave?

MR. KUHL: Right.

THE COURT: I will leave that on that side of the bucket then.

MR. KUHL: Again, I mean, I think an enclosed space that resembles an interrogation room, he's outnumbered by armed guards, they're recording him without his knowledge or consent, they're in a room that has a video camera, so I think the impression is that he is being recorded. He's never told that he is free to leave. He's never told that, you know: If at any point you want to end this, you can.

And I think --

THE COURT: So he's never told he's free to leave; he is being recorded; there is accusatory language; he is in a limited space; he's outnumbered.

Where, if anywhere, goes this theory that they're basically tricking him? That he was confused as to why they were

there, and that they're using his immigration situation basically to their advantage?

MR. KUHL: I think it goes to the point of coercion. And so again, Your Honor is not being tasked with saying what did Mr. Renaud subjectively think. If Mr. Renaud subjectively thought that he wasn't free to leave, then we have it, right; he's in custody. It's not that question. It's an objective question: What would the reasonable person think given these facts?

Obviously, this whole bit about Haiti, this goes to a subjective belief in that we see that the coercion worked, right. It's evidence that the coercive environment that the Miranda court is concerned with, this incommunicado interrogation room, where you never know if you're going to get out, so you need to be warned that you can remain silent, et cetera, that's the coercive element of that environment that the court is guarding against with the prophylactic Miranda warning.

And so all of the: Thank you for your help. Here are my documents, doing what he can to just cooperate with the Department of Homeland Security, even if he misunderstands why they're there and the state of Haiti, it shows, right, that even though they're not down at the station house, this is still a coercive environment that rises to the level of a Miranda warning being required. And we know that because here with him --

THE COURT: You're still not answering my question, which makes me think that the law might not be on your side.

MR. KUHL: Maybe I just misunderstood your question.

THE COURT: Right, so I'm going to ask it again.

As I'm looking at the facts, again without listening to the whole audio, I think one argument could be made by the defense, and maybe it's the argument you're making and we're missing each other here, one argument could be made that the government shows up; they know or should have known that he was in communication with them about an immigration situation that was highly sensitive and incredibly important, right, given the situation in Haiti and given the uncertainties about his immigration status; and that they showed up as if they were there to help him, right, as if to sort of lure him into making statements to them, right. So all along he's thinking: You're here to help me. You're the people that I sent an email to five months ago and, you know, they were supposed to assign someone to help me, and you must be those people, right.

What say you as to whether or not -- I know it's not his subjective intent, it's an objective intent, but a reasonable person could believe: If I have been emailing with an agency about this immigration situation and then they send somebody to talk to me that what I'm doing is talking to them about that. I'm not talking to them about any other kind of criminal exposure.

I don't know, again, do the facts in the rest of the tape bear or don't bear that out? And even if that's borne out, how does that play into the legal analysis on coercion?

04:06PM MR. KUHL: So I don't have a case about which way it cuts; so I'm not tried trying to hide the ball there, I just don't have the answer.

04:07PM THE COURT: Okay.

04:07PM MR. KUHL: And then insofar as the whole recording is concerned, they do talk about his background in the country in the back-and-forth with USCIS; but the bulk of it, the overwhelming bulk of it is, you know: Have you voted? Did you sign this? Did you read this form? Did you sign this form? How did you sign this form, et cetera. Now, this one is dated this date. What about -- like, same question. Same questions: How are you doing this? And have you ever voted? Where did you go to vote? That kind of stuff. It's not -- to my recollection there's not questions being asked about, you know, his entire history of immigration.

04:07PM Towards the end of it the government -- I think it's the USCIS agent, like, kind of clarifies for Mr. Renaud that his N-400 application has been denied, right. He walks Mr. Renaud through, like, checking the receipt number and says essentially: See, right there it says denied. You are not a citizen. Do not vote, right. He says that repeatedly.

04:08PM So I don't think that answers your question; that's just kind of a summary of my recollection of the recording.

04:08PM THE COURT: Okay. All right. Because it seems to me that given what his reaction is afterwards that he might have

thought that they were there, right, to help him with his immigration situation because he had been talking to immigration or emailing back and forth, right, before this with respect to his situation?

MR. KUHL: Yes, that's right. And so I think that's a plausible inference from the evidence. I would be hesitant to commit that a reasonable person would think that.

But subjectively I think that there might have been a misunderstanding on Mr. Renaud's part.

THE COURT: Okay. All right. Let me hear from the United States.

MR. PIERCE: May I have a moment real quick, Your Honor?

THE COURT: Sure.

(Brief pause to confer with Agent Olson.)

MR. PIERCE: Thank you, Your Honor.

So I think when we look at the totality of the circumstances, Your Honor, and we look at what really are the factors in this case, I don't believe that it rises to the level of suppression of these statements.

So I want to talk first about the fact that this defendant had absolutely no obligation whatsoever to speak with Special Agent Olson.

THE COURT: Except would he have known that? How would he have known that?

MR. PIERCE: I mean, he could have simply not returned

her call. He could have simply saw that it was a HSSI-DHS business card and said: I don't want to talk to her.

THE COURT: Right. But you would agree that before he got that card, he did want to talk to somebody at Homeland, right? He did want someone to address his immigration issue.

MR. PIERCE: Sorry. I didn't mean to -- if you had more to say.

THE COURT: No.

MR. PIERCE: His communication would have been with USCIS. Even though it's under the Department of Homeland Security, USCIS is a really a different subentity.

THE COURT: You would have to really be someone in the know to know that. I think an objective citizen -- he is not a citizen, but an objective person who has been living in the United States might easily think it's the same organization.

MR. PIERCE: That's true. But also this is an individual who has been going through the immigration proceedings since 1993.

THE COURT: Correct. So when you're getting that correspondence, it says Department of Homeland Security, right? It says those things, so it would be very easy for someone who has been in the process, who just recently was reaching out for someone to contact them to think that the person contacting him is contacting him for that reason.

MR. PIERCE: True.

THE COURT: So I take issue with your argument that he

didn't have to call her back. Well, he called her back because he had been reaching out to the agency. I think an objective person might think that the call was about that because why else would someone be calling you?

MR. PIERCE: True. But this would have been the first time that they had ever gone to him. USCIS always reaches out via mail. They always send correspondence, and he responded to that in writing all the time. So now for someone else to come and talk to him in person, this should I think show that this is something different; that this is not --

THE COURT: I do not think an objective person would sit there and think: Oh, this has got to be different. They must be investigating me for a crime. Let me reach out. I want to talk to them.

MR. PIERCE: The reason why I mentioned that, Your Honor, and it's because specifically in one of the cases that was cited by the United States is that -- it's United States v. Woodson. Well, I know the facts of that are different. I know that in that case he was interviewed inside of a police vehicle outside of his home.

The reason why we cite that case is really for two reasons:

One is the fact that they noted in there in the court's ruling that neighbors could have peeked out their windows and seen that he was being questioned by law enforcement. The same thing

happened here. He is in an office, there is a window, which the agent testified that it's a crowded Camillus House area, people are walking by, so I think there is --

THE COURT: I'm interested in looking at that case on those facts again because they're not in uniform, right, the ones that are armed; so really nobody would necessarily know that he is speaking to law enforcement. He could be talking to a myriad of people who could be trying to provide services to the people at Camillus House.

MR. PIERCE: Okay. But the other reason why I cite that is that the court specifically said that at least in the defendant's position, Mr. Woodson's position -- hold on one second. I want to make sure that I quote it correctly.

I will come back to that because I have it highlighted but for some reason I'm not seeing it right now.

When we look at the second factor for you to consider, I think the familiarity of the location of questioning, specifically Camillus House, it's a place that he is familiar with, if he lives there as he claims he does, I think that the case law shows that if you're interviewed in a place that that's familiar with you, courts are less inclined to find that it's a custodial interrogation.

I think you look at the Woodson case, he interviewed outside of his house. You look at the United States v. Brown case --

THE COURT: That's an interesting point too which is not exactly on all fours. Because if I'm in my home, I might feel, or in my mother's home, you know, a place I'm familiar with, I know that this is sort of my space and I control, if you will, and have certain dominion over my space. And if an agent is coming in to talk to me, well, I can tell that agent to leave and I can leave my house, right. It's my space. I can leave my room. I mean that's not Camillus House, right. That's a homeless shelter.

And by the way, it's a homeless shelter where he certainly doesn't have any kind of proprietary interest in Camillus House. He has to go through security before going into Camillus House. I mean, I'm not pretending to be an expert on homeless shelter rules, but I don't think that that's the kind of familiarity that the law recognizes. I mean he's basically a guest at Camillus House when he's there.

By the way, there is no evidence here that he sleeps there or is there regularly. It appears he takes mail there. I read that somewhere, right.

MR. PIERCE: Correct.

THE COURT: Clearly he has some connection to Camillus House; but whether he gets his mail there or whether he's been living there for two years, the record is silent on that.

MR. PIERCE: Okay. Let's move on to the duration of the questioning, which I think is a factor Your Honor can take into consideration. This is a 45-minute interview. I do very much

encourage because I think it plays hand in hand with the tone throughout, the first thing you hear in that interview when the recording starts is honestly laughter between the agents, and it's sort of a very calm, very friendly atmosphere.

I do think that there are certain questions and I'll concede that they're probably questions mostly from Officer Duarte where it does get accusatory, but I don't think it rises to the specific level because Agent Olson and Special Agent Hughes are really there to provide this sort of neutral calm atmosphere throughout. And I think if you hear the entirety of the interview, I think you will find that the tone remains that way. It doesn't rise to the level of accusatory. And I know that specifically the fact that it's a 45-minute interview would lean towards it not being something -- a custodial interrogation.

I think also another factor is the absence of restraints. He was never handcuffed. He was never -- there is no evidence or any testimony that he was ever touched, threatened. They never pointed any weapons at him. There is an uncited case, United States vs. Vorarut Vorasiangsuk, V-o-r-a-r-u-t, V-o-r-a-s-i-a-n-g-s-u-k, 2021 Westlaw, 3502956 out of the Eleventh Circuit. These officers questioned the defendant specifically about his possession of CSAM, and one of the considerations that the court took into -- when analyzing whether he was in custody or not was whether there was any type of physical restraint custody touching when they moved him to go talk to him about whether he

possessed any type of CSAM. And I think that that's something that United States v. Brown, which is 441 F.3d, 1130 of the Eleventh Circuit 2006, they also note that the lack of custody -- or the lack of any type of handcuffing or restraints during the interview is a consideration that leans not towards being in custody.

I think also when you look at the fact that he was able to leave afterwards, the fact that he was able to leave, he wasn't arrested is a fact that Your Honor can take into consideration as well. That happened specifically in United States v. Meugge, M-e-u-g-g-e, 225 F.3d 1267 out of the Eleventh Circuit in the year 2000. He was immediately after the interview allowed to leave and not arrested. And in fact that happened in Woodson as well; he was also not arrested.

So I think taking into account the totality of the circumstances, the fact that I still --

While I understand Your Honor's argument and position about --

THE COURT: Oh, I don't have any argument.

MR. PIERCE: Sorry. I understand your statements regarding whether or not Camillus House could be a place that he claims as his own, I think there is -- there is an argument to say that I think that people who do stay at Camillus House do take some sort of ownership of their space when they're there. They bring their items with them. I think that there is probably a

04:19PM culture that, you know, there is no evidence about that that came forward today anyway, so.

04:19PM But I think people who find themselves living in a shelter do still find that that's a place where they live; so I think that's a familiarity to him. He goes there. He gets his mail there. He's had a PO Box there for a very long period of time. I think the fact that he -- the interview was a short period of time, I think that the absence of physical restraints, the plainclothes, the tone of the interview throughout, which Your Honor will look at, I think when you look at all of that, I think that this was not a custodial interrogation. I think that he was not in custody. We would argue that he would have been -- that an objective person would have felt free to leave at any time. No one blocked the doors when he was in the office. He willingly answered these questions, and I think based on that that the motion to suppress should be denied.

04:20PM THE COURT: What say you to the issue that I raised with the defense: That the government goes in there. They knew or should have known that he had been or tried to be communicating with them with respect to an issue of relevance here, which is citizenship, and that he is responsive immediately and that they're not forthcoming to him that he is under investigation, or were they -- like I said, I know that you were having some trouble with the audio, and I will listen to the whole thing in any event.

04:20PM But what say you to the fact that they don't bother to

even tell him why they're there? Or do they tell him when they're there? When I listen to the whole interview, will I hear that?

MR. PIERCE: You won't hear them specifically state that: We're here to investigate you for voter fraud. You won't hear that. And you won't hear --

THE COURT: And why didn't I hear that? Aren't you troubled by that? Don't you think a federal agent when they go to talk to someone, they should say why they're there?

MR. PIERCE: I think to a certain extent, yes. I think they should. I think that that is something that should be made known to an individual. I will concede that.

THE COURT: Right. And so they don't let him know that. I mean now they're chasing down people at Camillus House, right, and they're not telling them why they're there. And if they had done some diligence, which I think they should have or maybe they did do some, they would have known that this was somebody with a, I think she even testified, a somewhat complex extensive history with immigration, who is obviously, given the situation in Haiti, trying to remain here.

And that never crossed the agent's head to think: You know, this guy thinks I'm here to help him. Good for me. I'm going to ask him some accusatory questions so that I can turn around and take it to the grand jury next month. That doesn't bother you? I mean it might be legal to do that, which is a whole different thing, right.

MR. PIERCE: Yes.

THE COURT: If you could do that, then I'm going to deny the motion.

But I'm just wondering if that doesn't bother you if that's what's happening because it should bother you if that's what's happening?

MR. PIERCE: Yes, Your Honor. I agree, yes.

THE COURT: By the way, we do have -- the agent is still here -- we actually have a constitutional process by which citizens elect the president of the United States and the president of United States is certified as the president of the United States.

I encourage the agent to look at the Constitution and to read up on the Constitution and what is required and the fact that the constitutional process that is required and mandated by the Constitution for the election of 2020, as in every election for the last 250 years, was followed. That might be something that your agent might want to look into, given that she is a special agent with the United States and takes her oath to follow the law and is, in fact, trying to prosecute people with respect to voting fraud. It might be a good thing for her to understand. I think that would be helpful.

I don't know that those questions will be -- if there is a trial in this case, I don't know that the defense will get to ask those questions there; but I understood why they were asking

them today. I think it goes to the credibility of the officer; it goes to her intent. I mean, those are fair questions to ask at a hearing. I don't know that they're going to mean anything at the end of the day, but I let the defense ask them because they're entitled to explore those things; especially in a motion to suppress where I don't have a jury present; they're entitled to explore that.

Again, I don't think it means one thing or the other for me. I have to determine the facts and the law. I know what the law is on these motions to suppress. It's a tough hill for the defense to climb, but there are some things here that I think are troubling, and I'll will have to listen.

I can't make a ruling from the bench, although I typically do on these. I don't think it's fair to the government or to the defense that I make it without listening to the interview because at the end of the day, right, a lot of these arguments on both sides are going to hinge on the interview; so I will go ahead and do that.

You will get me a response to the motion to dismiss the count by the end of the week.

MR. KUHL: Yes, Judge.

THE COURT: And I will reset it for argument on that and I will rule from the bench on this motion to suppress. I just have to listen to the audio. If I have any trouble, I'll reach out to the government to make sure I don't have the same trouble

you did. My computers come from the same place yours do.

MR. PIERCE: I think it was trying to restream it. I had it downloaded, but for reason I think it was trying to restream it to the Wi-Fi and it couldn't connect, so.

THE COURT: I've got the same government procurement office and the same Wi-Fi you do; so if it doesn't work, I will let you know.

MR. PIERCE: Okay.

THE COURT: All right. Anything else on behalf of the United States?

MR. PIERCE: No, Your Honor. Thank you.

THE COURT: Anything on behalf of the defendant?

MR. KUHL: Yes, Your Honor.

MR. PIERCE: Sorry. I think we're set for calendar call on this as well today.

THE COURT: Call hold on.

(Brief pause for scheduling.)

THE COURT: Go ahead.

MR. KUHL: I just wanted to briefly respond to the question you were asking both of us. I had time to reflect when I was listening to Mr. Pierce talk. If I could just briefly address the Court about that, I would appreciate it.

THE COURT: Sure.

MR. KUHL: So look, the more I think about it, what is an interview if it's not a custodial interrogation? It's a

consensual encounter, right. And so it's, right: You don't have to be here. You're free to leave. You're free to walk away.

And so I think one case that might be instructive here for the Court as you're trying to work through this issue would be Bumper vs. North Carolina. That's 391 U.S. 543. You know, that's the case that basically says consent needs to be freely and voluntarily given.

And so maybe it doesn't sound on Miranda terms, right. Maybe the answer to this question is not -- because again, I said I don't have a case. Maybe it's not a Miranda question. Maybe it's a voluntariness question. And so I didn't put this in the motion. I don't think it's too late to note this, so I am going to make an ore tenus motion at this point to move to suppress the statement on the basis of the due process clause because the statement is involuntary. And I think that Bumper vs. North Carolina talks about, you know, consent; and there it's obviously in the Fourth Amendment context.

But consent needs to be freely and voluntarily given to the government. And so if this individual is going to engage in an encounter with law enforcement and consent to this custodial interrogation in whatever way, shape, or form --

THE COURT: Look, you have till Friday to give me your best case on voluntarily; so does the government.

MR. KUHL: I appreciate it.

THE COURT: I appreciate the AUSA admitted, yeah, this is

04:27PM probably not the way it should go. But whether or not it should have gone this way or not and whether or not that rises to the level of either Miranda or voluntariness I think is a separate question. I think the government rightly conceded that this is probably not the way it should have gone down; but I think one of the reasons they conceded it was because it doesn't really go to the issue.

04:27PM I don't think it gets you to voluntariness, and I think the government knows that.

04:27PM MR. KUHL: No, I hear you, Your Honor. I just at the end of the day, right, I think HSI agents, they cornered a homeless man inside of an vacant office at a Catholic charity, and they questioned him about federal crimes for nearly an hour, right. And as soon as they tell him he's not a citizen and he admits that, yes, he's voted in an election, they just continued to get him to incriminate himself with just more evidence.

04:27PM It's very distinctly accusatory. I think that matters for the custodial interrogation and, you know.

04:28PM THE COURT: Which is why I have to listen to the whole thing because the government's position -- I mean he concedes there is a period there that it looks like that; but you have 45 minutes; and so in the totality of it, I think that's the government's position.

04:28PM Look, I appreciate the government's candor. Some of this, you know, doesn't look great. None of us -- at least that's

not my job. I don't even -- well, maybe it should be the government's job.

But it's not my job to determine whether or not I like it or I don't like it; it's my job to determine whether it passes constitutional muster. And the law in the Eleventh Circuit is what it is, and I don't think on these points it's particularly vague, and so I will listen to the whole thing.

I'll consider your argument under voluntariness. You can submit just a notice of authority on that. Government, you're free to do so as well just to respond as to whether or not if in fact, right, the failure to tell him why they were there, does that erode the voluntary nature of the interview because it seems like there is no dispute that he wasn't told what the agents were there for. It's peculiar, right, because any objective person could have thought they were there for this other thing, right, given the history.

It might go to voluntariness. I don't think so, based on my knowledge of the Eleventh Circuit, but I'm happy to read anything you all give me.

All right. Anything else on behalf of the government?

MR. PIERCE: No, Your Honor. Thank you.

THE COURT: On behalf of the defendant?

MR. KUHL: No. He did mention the calendar call though.

THE COURT: I know we're on calendar call, but we will definitely have some sort of hearing, Zoom or something, before

04:29PM the July trial date to figure out the motion on constitutional grounds, which I find interesting.

04:29PM Government, you don't need that count. You might want to think about that. It's not a count you need.

04:29PM MR. PIERCE: True. It's a novel issue that has come up specifically in these cases. I think this is now the fourth case that this argument has come up specifically as to that count. I think there is one in West Palm, Fort Lauderdale. This is my second since I'm handling another one, another voter case, so.

04:30PM THE COURT: If anybody has what the decisions of my colleagues has been, that would be interesting.

04:30PM MR. PIERCE: Not yet.

04:30PM THE COURT: We're all waiting.

04:30PM MR. PIERCE: I think you might end up deciding this first.

04:30PM THE COURT: You think. Is it that my colleagues are placing bets then on who goes first on this? Look, it is what it is. I will have to decide it before the hearing. The government probably should think about it before it continues to pursue; especially in a case where it doesn't need it; but again, that's not my job.

04:30PM All right. Trial is set for June 16th, right. It's a day. We're still at a day. Remember, I can't do more than the day.

04:30PM MR. KUHL: I thought it was couldn't do more than two

days.

THE COURT: Did I tell you two? I think I can bleed to the next day, but that's about it because I have to leave. June 16th, yes.

MR. KUHL: Okay.

THE COURT: I'm sorry, counsel?

MR. PIERCE: No, I thought it might be two days.

THE COURT: Okay. That's fine. I just have to leave at the end of that week. Remember, I can't bleed over.

MR. PIERCE: Yes, I do recall you saying that.

THE COURT: And I know there is some concern. I mean the defendant isn't waiving speedy. They want to move forward with the June date, right?

MR. KUHL: That's correct.

THE COURT: Okay. All right. Thank you very much.

(Proceedings recessed at 4:31 p.m.)

C E R T I F I C A T E

I, VERNITA ALLEN-WILLIAMS, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable JACQUELINE BECERRA, one of the judges of said Court, at Miami, Florida, on May 26, 2026.

/s/Vernita Allen-Williams
Official Court Reporter
United States District Court
Southern District of Florida
305.523.5938